[Crim. No. 13053. In Bank. Dec. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM DALE ARCHERD, Defendant and Appellant.

618

---

## COUNSEL

Ira K. Reiner for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

---

## OPINION

**McCOMB, J.**—Defendant was charged by indictment with three counts of murder and with a prior felony conviction. Trial was by the court. The prior (conviction of possession of morphine sulphate (Health & Saf. Code, § 11500) and service of a term therefor in a state prison) was found to be true. Defendant was found guilty on each count of murder in the first degree—murder by poison and willful, deliberate, premeditated murder. On each count he received the death sentence. This is an automatic appeal. (Pen. Code, § 1239, subd. (b).)

Count I charged defendant with the murder of Zella A. (Winders) Archerd on or about July 25, 1956; count II of Burney Kirk Archerd on or about September 2, 1961; count III of Mary Brinker Post Arden on November 3, 1966. Evidence of other offenses was introduced to show common plan or scheme, namely, the murder of William Edward Jones on October 12, 1947, of Juanita Archerd on March 13, 1958, and of Frank L. Stewart on March 17, 1960; also a fake hit and run accident involving defendant on October 10, 1960.

The lapse of time between the various offenses and the indictment of defendant on July 27, 1967, is considerable but is adequately explained by the record. The murder weapon in each case was unique, insulin. The deaths of each of these victims were initially attributed to causes other than a criminal agency. Suspicion of insulin and of defendant as the person administering the insulin was not aroused until the death of Zella in 1956. It was not until years later, after much painstaking and persistent investigation by law enforcement officers, and the discovery of advances made in

medical knowledge and techniques, that sufficient evidence could be accumulated to charge defendant with these deaths. Unfortunately, by then other of defendant's victims had lost their lives. This is the only known reported case of murder by insulin poisoning in the United States. Only one other, reported world-wide, occurred in England in 1956.

■ Following a judgment of guilt we must review the record in the light most favorable to the People (*People* v. *Teale,* 70 Cal.2d 497, 502 [75 Cal.Rptr. 172, 450 P.2d 564]). The test on appeal is whether the evidence is sufficient to support the finding of the trier of fact (*People* v. *Hillery,* 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]). The record is voluminous, consisting of 5,476 pages of reporter's transcript, much of it relating to medical evidence because of the unusual nature of the case. It would unduly burden this opinion to recite the evidence in any detail, particularly the medical evidence. ■ Review of the record, however, indicates that the evidence in support of the findings of guilt on the counts charged was substantial. It also indicates that the evidence offered of other offenses, introduced to show similar plan, was substantial and supported the court's conclusion that they, too, were proved beyond a reasonable doubt although only preponderance of the evidence was the proof necessary.

Preliminarily it may be stated that each of the victims was closely associated with defendant. They included three of his wives, the ex-husband of another wife, a nephew and a friend. Each of the wives seemed to have been deeply in love with him, and the nephew and friend to have trusted him. Each became an unwanted burden to defendant. In each instance a pecuniary motive was present. The defendant was experienced in the technique of administering insulin and had knowledge of its symptoms and effects. In addition to the unique method of murder utilized, the circumstances surrounding each death reveal marked similarity. He had access and opportunity in each instance and in the case of his deceased wives, Zella, Juanita and Mary, he was the only person with them at the time when, according to the experts, the insulin injections were given and he remained with them and deliberately kept them from entering a hospital until it was too late. In the case of his friend and his nephew, the evidence was that they were injected both before and after they entered the hospital, and in each instance the injection of insulin was part of a plan to "fake" an accident and consequent head injuries. Much of the evidence was circumstantial but some of it was direct and all of it was substantial. It was the opinion of 15 experts at the trial, including attending physicians, autopsy surgeons and experts in the fields of diabetes and hypoglycemia, pathology, insulin and research and its relation to pathology and insulin shock therapy, that all six of the victims died from hypoglycemia caused

by an injection or injections of insulin, none had any prior history of hypoglycemia, none had ever evidenced or complained of any of its symptoms.

Hypoglycemia is a state in which the blood sugar is lowered below normal levels. Some forms have never been reported as fatal. Among the forms that may result in death there are two classifications. The first are those causes which are obvious and readily recognizable either by the physician or autopsy surgeon. These include liver disease which causes obvious changes; non-pancreatic tumors are never reported less than the size of a grapefruit and cannot possibly be overlooked by an autopsy surgeon; more rare types of cancer of the adrenal glands, stomach, cecum and lungs, which are also of obvious size. As a general rule each is accompanied by prolonged period of progressive symptoms; a person is not normally healthy one day and dead of hypoglycemia the next. The major remaining cause of severe hypoglycemia that may be more obscure in manifesting its origin relates to the pancreas, and is always accompanied by a long period of progressive symptoms of hypoglycemia before severe symptoms result. History of these symptoms, and of weight gain over a period of time (the afflicted person learns that increased caloric intake can alleviate the symptoms) are important. A further condition, called hyperplasia of the islets of the pancreas might have the same symptoms as the islet cell tumor but is obvious to the pathologist on examination of the pancreas cell.

Endogenous hypoglycemia may be caused by failure of the adrenal or pituitary glands, but this is always accompanied by symptoms such as a prolonged history of weakness, weight loss, loss of appetite, changes in texture and color of the skin, headaches, with episodes of low blood pressure, prolonged periods of no food and anatomical changes that will not be missed by an autopsy surgeon. Post-alcoholic hypoglycemia is rare, usually responds quickly to small amounts of glucose, and where death occurs the patients have usually had additional nutritional deficiencies. The major exogenous (introduced into the body) cause of hypoglycemia is insulin.

Defendant was employed as an attendant on the insulin shock ward of the Camarillo State Hospital between 1939 and 1941. While there he was trained as part of the ward shock team, consisting of two physicians, two registered nurses and four attendants. He had the opportunity to give injections of insulin, under supervision; was trained to observe danger signals while the patient was under insulin shock and to give necessary therapeutic measures to protect the patient; and was allowed to give injections of glucose to bring patients out of shock. He frequently discussed the happenings on the ward with a neighbor and fellow-worker. On two

occasions while there he injected fellow workers so that they would know what it was like. At the trial he admitted injecting himself, and some of his wives, for migraine headaches, but denied ever injecting any of them with insulin.

Dr. Grace Fern Thomas, a psychiatrist and an expert in insulin shock therapy, and director of the insulin shock department at the time defendant was at Camarillo, testified as to the procedures on the ward. A precise dosage of insulin was measured for each person at a particular time. At a specific level that patient would go into shock in approximately two hours after the injection. Patients do not progress at the same level. Careful watch must be kept of the pulse, color, blood pressure, general condition, and neurological signs, such as pupillary changes and body motions. When a patient is going into progressive stages of coma he sweats very profusely and breathes very heavily. Saliva is secreted in large amounts, mucous flows freely and mixes with the saliva, and the patient must be carefully watched, turned, or assisted so that he does not aspirate the fluid into his lungs. Otherwise bronchopneumonia may develop, leading to death. The gag reflex and the cornea reflex are lost. Convulsions may occur, and medication is given to prevent this. The extremities may stiffen. At a relatively deep level of coma the Babinski test (scatching the sole of the foot in a certain manner) will cause a reflex known as the Babinski response (toes fan out). The patient must be brought out of the coma within 10-15 minutes thereafter. This is done by administering glucose through gastric tubes, and if this is not effective, glucose is administered intravenously to raise the blood sugar. If the brain is deprived of blood sugar for a prolonged period irreversible brain damage and death may result. As soon as a patient is fed glucose he awakens and is hungry. Only regular insulin was used in the ward because it was the only insulin where the time of coma could be calculated for therapeutic use. Injections began with small doses, very gradually increased over a three-week period.

*Similar Offense—William Edward Jones, October 12, 1947*

This offense was prior in time to the first charge in the indictment but was offered to show common design or plan.

In 1947 defendant was living in Fontana with his wife Eleanor. He was then dating Dorothea, a nurse at the Kaiser Hospital. She was in love with him and when he asked her to purchase a bottle of insulin for him she did so, and did not tell the authorities until some years later of this purchase or of the plan he told her about. This was to fake an automobile accident in which his friend Jones would appear to have suffered head injuries, but would actually have been injected with insulin by defendant to simulate

these injuries. Jones had been arrested for child molesting, was out on bail, and it was defendant's plan to have him "injured" and to buy the child's family off so that they would go back to Indiana and there would be no one available for questioning in the matter. Defendant and Jones came by Dorothea's house on midnight of Friday, October 10, 1947, and picked up the insulin. She received a telephone call from him later that everything had gone as planned, the police had been anonymously notified, and Jones was in the hospital. The police found the car damaged, Jones sitting by a tree, and took him to the hospital. On admission he was conscious, nervous, hungry. He had a subnormal temperature and complained of a headache. These symptoms of insulin poisoning were not recognized. The symptoms became progressively worse, with profuse perspiration, muscle twitchings, irregular respiration, irregular pulse, and headaches. About 11 a.m. he was given a spinal puncture. His blood pressure and his sugar level were low. He was given 50 percent glucose. He went into a coma that afternoon and was again given 50 percent glucose. When this didn't waken him he was given glucose intravenously. According to the medical experts at the trial, by then his brain had been so damaged he could not wake up. His symptoms became worse. The following day he had frequent convulsions and respiratory distress. He died at 11 a.m. on October 12th. Cause of death was listed as undetermined. At the trial, reviewing the hospital records, the autopsy coroner's reports, and personal history, the experts were of the opinion that he died due to the effect of hypoglycemia caused by an excessive amount of injected insulin. Other causes of hypoglycemia were eliminated.

During the time Jones was in the hospital defendant was in and out of his room. Jones' sister, a trained nurse, saw him give Jones an injection, using a hypodermic needle and syringe and preparation left by the nurse for the doctor to administer but which defendant offered to do. It was possible for defendant to have administered insulin also at that time. There was some evidence that he received additional insulin while in the hospital. None was officially ordered or given to him.

The profit motive shown was that defendant suggested to Jones' family that they raise money to pay off the family of the molested child and he had offered to be the go-between. They had raised several thousand dollars which they gave him. He gave the girl's family three hundred dollars and a used car.

Dorothea married defendant in August 1949. Their marriage was annulled May 14, 1956. She did not know that he married again the next day until she learned on July 25, 1956, of Zella's death. It was not until she heard of the subsequent death of Juanita Archerd that she began to re-

consider the possible cause of Jones' death. In one conversation with Dorothea defendant told her that there was no test that would determine the level of insulin in the body, that it would be a matter of observation, because insulin shock so closely resembles other states that no one would think of looking for that as a cause of death.

### Count I—Zella Winders Archerd—July 25, 1956

Defendant and Zella were married May 15, 1956. On July 24 defendant and Zella reported a robbery at her home in Covina about 10 p.m. Defendant told Officer Hughes that two men had entered the house, one with a gun, the other with a knife; that the one with the gun had put defendant's bathrobe over his head and had gone into the room where Zella was undressing and attempted to put a pillowcase over her head but she wouldn't let him; the man returned to the living room and asked defendant to have Zella cooperate; and that defendant had then called out to her to do so. She allowed the man to put the pillowcase over her head. He gave her two shots with a needle in the buttocks. Defendant said that the man gave him a shot also, then tied him and Zella in different rooms, and left after taking $500 to $600 in cash and a revolver. The house did not appear to have been ransacked, there were no marks on any of the doors or windows, there were valuable objects left untouched. There were rope burns on Zella's wrists, none on defendant's. The officer saw the two needle marks on her hip, none on defendant's. Zella did not appear to be nervous. She said she saw only one man, he was the same height as her husband, and she asked the police officer if he thought it might have been her husband. An insulin bottle, still 1/4th full of insulin, was found by the officers in a nearby vacant lot. Its purchase could not be traced.

Dr. Chambers was called by the police officer but he found nothing wrong with either Zella or defendant. He left some seconal in case Zella became nervous later. During the night Zella became ill, was perspiring and had convulsions at approximately 8 a.m. Defendant did not tell this to the doctor when he called him at 8 a.m. to say he was worried about Zella. Had he done so the doctor would have gone to the house to see her. Defendant hired a Mrs. Rosenow, a practical nurse to sit with Zella that day, telling her about the burglary. Zella remained in a coma the whole time, she was sweating profusely and her clothes were wet. When Mrs. Rosenow changed the sheets she noticed the two needle marks. She also noticed a syringe with a needle in it in the bathroom. Defendant was alone with Zella around noontime. He left, visiting Zella's daughter and son to tell them of the robbery. He told Juanita, the daughter, not to worry, that her mother was a little upset but was resting in bed with a trained nurse in attendance. He told Robert, the son, to come visit Zella that night about 7 p.m. Robert

noticed that defendant had a large roll of bills in his wallet. Defendant returned to the house about 4 p.m. called Dr. Chambers and said that Zella was worse. Again he did not mention the convulsions. The doctor found her in a deep coma, thought perhaps she had been taking barbituates, suggested placing her in a hospital for tests. Defendant said they had no barbituates in the house, that Zella was afraid of hospitals and he had promised her he would not send her to one. He said he would check with the doctor later. At 5 p.m. she was dead. There were *four* needle marks on her buttocks. Sheriff's officers found a hypodermic needle in the bathroom, but defendant denied having seen it before. They found many pills. Defendant said he had wanted to send Zella to the hospital but the doctor did not think it was necessary. Death was ascribed to terminal bronchopneumonia due to coma of undetermined origin.

At the trial Dr. Chambers, upon review of the records and her prior history as related by her family and friends, gave as his opinion that her death was due to massive overdose of insulin, causing hypoglycemia resulting in a lack of sugar to the brain, producing permanent and total paralysis of the vital organs and terminal bronchial pneumonia. The two sets of puncture holes indicated more than one injection. Other causes of death were ruled out by the medical experts. Although the clinical signs of endogenous hypoglycemia are identical to the clinical signs of exogenous hypoglycemia, the former doesn't come on so suddenly. There was no way of proving the suspicion of insulin at the time of death. In order to determine the cause of death was exogenous hyperinsulin, the coroner would have had to find some routine that would have identified the insulin chemical within the tissues at the injection sites. In 1956 there was no such routine known to the surgeons at that time. The investigating police officer did not believe the robbery story but had no proof of a criminal agency.

At the time of her marriage to defendant Zella had just sold her home and subsequently received $10,000 from escrow, which she deposited in a joint checking account with him. While the escrow was pending he urged the realty office to hurry the escrow as he needed the money for a large transaction. After her death some of the check stubs and checks were missing from her checkbook. The balance in the account was depleted by checks other than those appearing in the check stubs in the amount of $8,798.80. Included were counterchecks for cash endorsed by defendant. On the day of her death he had a large roll of bills in his wallet. A few days later he offered to pay $1,000 cash to recover a repossessed new Thunderbird. Zella's estate was insolvent. He was the beneficiary under her insurance policy also. He was unemployed.

*Similar Offense—Juanita Archerd—March 13, 1958*

Two months after Zella's death defendant met Juanita Plum and began to live with her in her home in Monrovia. They separated around August 1957, became reconciled and were married March 10, 1958, in Las Vegas. She died three days later. On the morning of March 12 defendant called an ambulance for Juanita, but Dr. LaCanna at the hospital released her after a few minutes diagnosing her condition as "no disease, had been drinking." No history of overdose of barbituates was given to him. In Dr. LaCanna's opinion anything that happened to her occurred *after* he saw her that morning. Defendant and Juanita returned to the motel about 9 a.m. He immediately called Dr. Jack C. Cherry, who examined Juanita and thought she was under the influence of alcohol. She was not coherent, was semi-conscious, was perspiring. Defendant told the doctor she had taken barbituates and had been drinking. He ordered that Juanita be given black coffee and kept on her feet. Several hours later the motel manager Mrs. Allen tried to rouse Juanita but she was too groggy to talk, her face was swollen, she was perspiring profusely. Juanita was taken to the hospital by ambulance about 4:30 that afternoon. She was unconscious, pupils contracted, temperature low, pulse and respiration poor, and was cyanotic. She was given medication, including glucose and nembutol to treat the convulsions which started the next morning. She did not respond to the glucose, and died at 3 p.m. on March 13. The attending physician was of the opinion that she died of cardiac failure as a result of barbituate poisoning. The experts at the trial, including the attending physician, were of the opinion that the signs and symptoms at her death were not consistent with death due to an overdose of barbituates, or post alcoholic hypoglycemia and were only consistent with death due to insulin shock, administered by injections prior to the time of her admission to the hospital. Juanita was alone most of that day with defendant in the motel room.

At the time of her divorce from Myron Plum in April 1956, Juanita received the family home, had about $10,000 in savings, $1,000 in a checking account, and remained the beneficiary of various insurance policies of her ex-husband. There was evidence that about $10,633 was depleted from her bank account during the period she was married to defendant. He was unemployed most of the time. The night before her death he called her daughter Joanne and told her that he needed $1,000 to $2,000, to bring that amount to Las Vegas and not to tell her father. She did tell her father and they drove up together but they did not give him any money. When Juanita died Joanne became hysterical and accused defendant of having killed her mother. He threatened to kill her if she didn't shut up. He was left $1.00 in Juanita's will.

*Similar Offense—Frank L. Stewart—March 17, 1960*

On October 4, 1957, defendant, under the name "James Lynn Arden," married Gladys Stewart, ex-wife of Frank L. Stewart. They were remarried in La Habra on May 21, 1959, defendant using his name William Dale Archerd. Stewart was released from the hospital in February 1960. The doctor told defendant that Stewart had severe arteriosclerosis, a serious condition of the blood system, and that drinking could hasten his death. Stewart was a heavy drinker. A week before Stewart's death defendant told James, husband of Gladys' daughter Mary, that Frank could not live much longer, that he and Frank had arranged an accident where there would be some insurance money, and defendant asked James to lend him some money. He also suggested that James and Mary could have Frank declared incompetent and handle his affairs if he came into the money from the insurance.

The plan devised by defendant, as told to his current girlfriend, Stella Morin, was that Stewart would appear to have an accident at the airport in Las Vegas, that the head injuries would be simulated, and would be caused by an injection of insulin to be given by defendant. Defendant invited her to go to Reno with him and another couple the weekend of March 4, 1960, the girls driving on ahead in defendant's car. Twice defendant left them stating that he was going to the airport to meet a friend. The friend did not arrive. On March 16 defendant again asked Stella to go with him to Las Vegas, to drive on ahead and register for the two of them as "Mr. and Mrs. Don Nightengale." He gave her a small package, asking her not to let it out of her sight. She met him at the airport in Las Vegas, taking the package with her. He said he didn't need it just then, that Frank had fallen, had hit his head and they would take him to the hospital. Defendant went in with Stewart at the hospital but only remained a few minutes. When defendant came out he said that they were keeping Stewart for observation. Later defendant told her that Frank had not really fallen, that they had taken out flight insurance, that since Frank had been "hurt" on airport property the insurance would pay off, that Frank was so stupid he couldn't even make a fall by himself, and that he (defendant) had to fall and then have Frank take his place. He was going to give Frank some medication which would appear to make him have a headache. Stella woke up about 10 a.m. the next morning. Defendant was up and dressed. He asked her to go to the hospital with him, he said that he had to give the medicine to Stewart. He took the package into the bathroom, came out with a needle and syringe in his handkerchief. She waited in the car at the hospital but when he came out he said they would have to try again, that someone had come and that he had had to get rid of the medication.

He showed her a diamond ring, said that he had loaned Stewart some money, that he did not think Stewart wanted the ring back and that defendant would have it made into a ring for Stella. He went to a doctor's office, then to a drug store where he made a purchase. When they returned to the parking lot at the hospital he took out the needle and syringe and inserted it into a bottle filled with clear liquid. He wrapped the needle and syringe in his handkerchief and left. She examined the bottle, saw that it was empty, later identified it as being identical in shape and clarity of liquid to a bottle shown to her at the trial labeled U-40 Iletin insulin. This was about 2 or 3 p.m. on March 17. Defendant returned, said everything was all right, and they drove leisurely back to Long Beach. Enroute he threw away the bottle, and he told her he didn't like people to cross him up, that when someone did cross him up he knew how to get back at them. He gave her a false story to give insurance investigators.

When Stewart was admitted to the hospital at 12:30 a.m. on March 17, defendant would not identify himself, said that Stewart had slipped on some debris in the men's room at the airport and hit his head, and that he had been briefly unconscious. There was a minimal laceration on his head, and slight contusion of the spine. He was rational, coherent, lucid. One eye was greatly dilated. The eye dilation could have been indicative of brain injury. Because of this and the history of unconsciousness he was kept for 24-hour observation. George Burns, a patient in an adjoining bed, saw Stewart when he came in and said he appeared to be rational, intelligent, coherent, smiling. Burns saw defendant sitting on the bed talking to Stewart about 7 a.m. Defendant was still there when Burns was discharged at 9 a.m.

About 4 p.m. Stewart began having severe convulsions. By 5:30 he was worse. He died at 10:30 p.m. An autopsy was performed the following day. The autopsy surgeon was of the opinion that Stewart suffered from arteriosclerotic disease and that death was caused from cerebral hemorrhage. It was not until he learned of Stewart's prior medical history, personal history, and heard Stella's story, that he made a re-evaluation. He then formed the opinion that death was due to an injection of insulin. He could think of no product other than insulin that could have caused the progression of symptoms. Lowering of blood sugar can precipitate a coronary occlusion or cerebral vascular accident. Death was the final result of the insulin through the mechanism of cerebral hemorrhage. The dilated pupil was not caused by cerebral bleeding. It could have been caused by eye drops.

Stewart had taken out two insurance policies at the airport: one for $62,500 with defendant's wife Gladys as the beneficiary (but he attached a note telling her to divide it between his two daughters and her daughter), and one for $18,750 with defendant's mother, Jennie Archerd, as bene-

ficiary. In an interview with the claims adjuster defendant said he was married but was not living with his wife, did not mention that Gladys was his wife, said that Stewart was just a friend. Gladys was the beneficiary of another policy for $2,450, which she deposited in a joint bank account with defendant. (The airport policies were not paid.) Defendant withdrew substantial sums from the account. He was unemployed.

*Fake hit and run accident—October 10, 1960*

About six months later, on October 10, defendant asked Stella to help him arrange another "accident." The plan was that he would phone a Mr. Crossley who had advertised a car for sale and tell Crossley that he was "Mr. Pierce" and was interested in the car; that Stella, posing as Mrs. Pierce, would phone and ask Crossley if she could pick up the car and take it to a mechanic for a check-up, and that Stella would then meet defendant at a certain place. He told her that he was having a hard time getting off from work to check into the Stewart deal, that this way he would probably go to the hospital for observation and could get a few days off to check on the other deal. He did some minor damage to the aerial and windshield wiper of the Crossley car, then wiped off all fingerprints, drove it to a parking lot and left it with the keys in the ignition. The police investigated a reported hit and run accident, found him sitting about six blocks from where the collision allegedly occurred and took him to the hospital. He told them he had been walking and hit, did not think he was hurt, but he took down the license number before the car drove off. It was the license number and description of the Crossley car. It was found on the lot where defendant had left it.

At that time defendant was working and he received $900 workmen's compensation, plus medical costs. At the hospital he complained of headaches and neck pains, was treated and sent home. He was readmitted on November 8. At that time he had a large dilated left pupil. This is a dangerous sign with a history of head trauma. Usually burr holes and percutaneous exploration are made, but this was not done because there were no other neurological signs to go along with the dilated pupil. Certain eye drops could have caused the eye condition. Many tests were given, all negative for any neurosurgical intervention. The symptoms manifested were so unusual the attending doctor considered writing it up for the medical journal, because he had never seen this type of condition in a post-traumatic patient. (Defendant told him that in September 1961 his cousin's son, a big 15-year-old boy, had been hit by a truck, was knocked down but got up and walked home, that he had one pupil larger than the other, that the doctors did not think it was necessary to operate and that the boy

died.) The doctor was of the final opinion that rather than trauma or migraine the most logical explanation for the dilated pupil of defendant's was self-administered eye drops to cause dilation.

*Count II—Burney Kirk Archerd—September 2, 1961*

Defendant's brother Everett died at work on January 22, 1960, leaving a 15-year-old son, Burney. The latter received $7,000 in a settlement of workmen's compensation claim for Everett's death. Defendant and Jennie mother of defendant and Everett, were co-guardians for Burney. Out of the death benefits paid by the local union defendant received over $1,000. Jennie died August 24, 1961, and the balance in her checking account was turned over to defendant. Substantial sums were withdrawn by defendant from the guardianship account. On Burney's death he became sole heir of his nephew as well as his mother.

Burney was a healthy 15-year-old boy. On the day he was "injured" Burney was at his grandmother's home. About 2 p.m. in the afternoon he helped a neighbor roll up her garden hose. He was neatly clothed and well groomed and was in good physical condition. About 4 p.m. defendant came and took Burney with him in the car. He had no injuries at that time. About 5 p.m. the sheriff's office was advised that Burney was involved in a possible hit and run accident and was at the hospital with defendant. Defendant told the officers that Burney had told him he had walked home from Lakewood, was partially across a street intersection when a red truck struck him, knocking him down; that he went over to the curb and sat down and wrote the words red truck and the license number on a piece of paper, and had then walked home (about 4 miles) and his grandmother had notified defendant. A red truck with that license number, the number being visible from the street, was in a used car lot. It was in poor mechanical condition, however, made an excessive amount of noise, and was visible from the office. It could not be driven away without it being heard or seen. No one saw or heard it leave. There were no recent scratches or bumps on it. A claim on behalf of Burney was made against the used car company but was dropped. Defendant told other people his nephew had been hurt while riding on a minibike.

When Burney was admitted to the Long Beach hospital, with the history of this accident, he had a widely dilated left pupil and a sore hip. He had a chipped bone on the latter. There were no neurological abnormalities other than the dilated pupil. He was awake, alert, hungry, and did not appear to be acutely or even seriously ill. Defendant stayed with him for about half an hour. During the night Burney was uncooperative, restless, and unhappy at being in the hospital. On August 23 at 7 a.m. he was

hungry, alert, and his temperature was down. Defendant visited him throughout the day, several times being alone with him. Without relating all of the medical symptoms and medical measures taken by the attending physicians, it is sufficient to note that defendant visited him at 6 that night, and by 10 p.m. Burney's condition had become so acute that the family was notified. A coma had come on suddenly. A burr hole operation found no evidence of hemorrhage or bruising of the brain; no evidence of blood clot was found. His blood sugar was low. There was no reason to suspect any physiological or pathological cause for this. He was fed glucose but responded only transitorily. A worsening of his condition appeared after he was transferred from the intensive care surgical unit, where there were constant attendants, on August 26 and placed in a private room in the intensive care unit. Defendant was alone with him several times in this room. He died on September 2, 1961 despite desperate measures taken by the staff to save his life.

The immediate cause of his death was found to be cerebral edema and pulmonary congestion with early bronchial pneumonia, a typical phenomenon that happens in a dying person. Brain slides were made and subject to microscopic analysis. This indicated that the damage to Burney's brain had occurred between a week and two weeks of his death, that it was damaged within a very short space of time, and that none of the damage was due to trauma, such as an accident or an automobile accident. The damage was overwhelming and uniform and whatever the insult it was very profound and occurred precipitously. There was no indication of any prior damage to his brain. There was documented evidence that while he was in the hospital he was not exposed to any kind of anoxia, carbon monoxide, cyanide, blockage of air passage, or any kind of obstruction to blood flow to his brain. A tracheotomy was done to prevent vomiting and aspiration, was not related to respiratory distress, and was performed long after the brain damage. There was no circulatory problem or cardiac arrest to cause anoxia.

At the trial the experts were of the opinion that Burney received a massive dose of insulin on or about the late afternoon of August 23, 1961, and this probably caused the majority of the brain damage shown on the slides. An injection of 50 units regular insulin at 6 p.m. on August 23 could have caused the changes in the vital signs which resulted in immediate coma at 8:30 or 9:30 p.m. The subsequent rise and fall of blood sugar was attributed to reinjections of insulin, because there was no infection in the spinal fluid to account for the lower spinal sugar reading. There was no other explanation for the dilation of the left eye except the use of a drug such as homatrophen. That symptom disappeared.

### Count III—Mary Post Arden—November 3, 1966

Defendant married Mary Post under the name James Lynn Arden on April 18, 1965, and again on November 12, 1965. She had a good job, received a salary increase after her marriage, had checking and savings accounts. Defendant never wrote checks or withdrew any funds but there was a total of $21,620.12 depleted from her accounts from May 1965 through October 1966. On October 20, 1966, she filed in bankruptcy. Many of her debts had been accumulated by defendant. He was unemployed. His only income was $165 received from the American Hearing Aid Company.

On October 28 there was an investigation of an automobile accident in Montclair in which Mary sustained superficial injuries, a laceration on her nose and some bruises on her face, with moderate damage to both cars. Mary left the scene without assistance. She did visit Dr. Gabriel Smilkstein, who had been her physician for five years. She was alert and did not complain of headaches, said she had not been knocked out or confused and had had no contact which might have produced a head injury. She was sent home. The only complaints she made to anyone were of the black eyes that developed. At that time she and defendant were separated, but she was sending him letters almost daily begging him to return to her. When he heard of the accident he did return, on October 31st. On Tuesday November 1st she was feeling fine. At 11 p.m. that evening neighbors, Mr. and Mrs. Field, noticed that the lights were on in the Arden house, including Mary's bedroom; and when Mrs. Field awoke about 3 or 4 a.m. the lights were still on. About 8 a.m. on November 2 defendant, dressed, in a nice suit, shoes shined, hair combed, and appearing to be very calm came over and told them he couldn't seem to wake Mary up, would they come over and see what they could do. They found Mary in her bedroom in a coma, with her face toward the wall. When the ambulance came Mary was turned over on her side. Her face was swollen, her tongue was out, saliva was coming out of her mouth, her eyes were pinpointed. The attendant asked if Mary had been taking sleeping pills. Defendant said yes and gave him the bottle. He did not mention that Mary had had convulsions slightly before 8 a.m. Mary was in a serious condition when admitted to the hospital. Defendant was so calm and indifferent that the nurses commented on it to each other. Tests showed that Mary's blood sugar was very low and there were some barbituates present. She was in the deepest form of coma. An electro-encephalogram indicated severe depression of cortical activity with no localizing features, indicating a profound comatose state wherein breathing and functioning continue but no thinking can take place. Survival may take place if a patient responds to treatment. Mary did not respond and died.

Defendant told Dr. Smilkstein that Mary had had one or two drinks and possibly some sleeping pills before they went to bed around 2 a.m., and that he was awakened at 3 a.m. because she was having convulsions, with stiffening of the body to the point of maximum extension, arching of the back and trembling. The doctor was puzzled by defendant's failure to report these symptoms to a doctor immediately. Numerous tests were taken in the hospital before her death, and in the autopsy thereafter. Without reciting the elaborate series of findings, it is sufficient to note that all other causes of death were eliminated by the experts at the trial, and the consensus was that she had died from a massive injection of insulin, given somewhere around midnight before she went to the hospital. She could have received additional insulin later, or there could have been a combination of regular and long acting insulin given her initially, since the blood sugar stayed down and actually got lower in spite of the fact that she was getting sugar. There is no hypoglycemic agent powerful enough to cause the continued drop in blood sugar in a comatose person other than insulin. No insulin was injected by the hospital. Her coma was not induced by either barbituates or alcohol.

The workmen's compensation claim by defendant was denied as there was no injury arising out of the course of employment.

Throughout the proceeding defendant was represented by counsel. Originally this was the public defender. He was relieved, because of conflict of interest prior to the arraignment and private counsel Philip Erbsen was appointed. Later the court appointed Ira K. Reiner as co-counsel to assist Erbsen. Defendant was authorized to employ medical and detective experts, subject to court approval as to the reasonableness of their fee. Defendant was authorized to make additional telephone calls to assist him in locating witnesses who had not testified before the grand jury. Complete discovery was furnished him at all times subsequent to the indictment. Any material witnesses indicated by the defense were either located for him by the prosecution or their testimony was offered by way of stipulation. Because of the great public interest aroused the court restricted the dissemination of extrajudicial information to insure that defendant received a fair trial.

Defendant pleaded not guilty to each count and to the prior. Defendant personally and all counsel waived a jury and agreed to a court trial on the guilt and penalty phases. Defendant waived the right to file an affidavit of prejudice against the judge. Pretrial motion to dismiss under section 995 of the Penal Code on the ground of insufficient evidence, was denied. Pretrial motions to suppress the evidence presented to the grand jury regarding the out-of-state charges admitted to show modus operandi, to dismiss the indictment and to sever the three counts were denied. Ruling

on motion to dismiss the indictment as to counts I and II for remoteness and prejudice to the defendant in preparing a defense was reserved initially, and was denied at the conclusion of the trial. Motion to dismiss all charges for failure of the People to bring a timely indictment, was denied.

Defendant requested additional time to prepare his defense. After carefully informing defendant of his right to a trial within 60 days and the right to a dismissal, the court accepted defendant's waiver of time for the commencement of trial.

At the arraignment the following interrogation took place:

THE COURT: There have been no promises made to this defendant as to what the outcome of either case will be or the penalty to be imposed?

THE DEFENDANT: No, there have not been.

THE COURT: Mr. Archerd, that is true. Mr. Erbsen and I have not discussed it and should you be found guilty of murder, first degree, what the penalty will be, and should you be found guilty I have no idea now what the penalty will be at all. I have made no promises to Mr. Erbsen. Has anyone connected with law enforcement made any promises to you as to what the penalty will be?

THE DEFENDANT: No one has made any.

THE COURT: You understand that I, and I alone, will fix that penalty?

THE DEFENDANT: Yes, sir.

Defendant now claims, for the first time, that 1) the trial judge offered him a reduction of sentence "in order to coerce, or at least to needlessly encourage" defendant into waiving his right to remain silent; 2) that the trial court held a secret ex parte meeting with the prosecutor and an investigator from the sheriff's office during the course of the trial; and 3) that the trial court made successful extrajudicial inquiries about the issues pertinent to the trial. Defendant also renews on appeal his contention that the long delay in the criminal prosecution was prejudicial to him and he was thereby deprived of his constitutional rights to due process and to a speedy trial and that it was prejudicial error for the court to allow the introduction in evidence of crimes not charged. He also contends that the judge misconstrued and misapplied the law in passing sentence on the defendant and therefore the sentence must be reversed.

*Questions. One. Was there misconduct by the trial court amounting to prejudicial error?*

*No.* Attached to the brief on appeal are affidavits of co-counsel Reiner

and of defendant in support of offer of reduction of sentence and the secret ex-parte meeting. Reiner avers that during the trial defendant was hospitalized for six weeks with a heart attack, and that Erbsen had told Reiner that the judge at that time called Erbsen into chambers and told him "I'm going to find [defendant] guilty and give him life, but I want to hear his story"; that the judge explained to Erbsen he would have defendant's medical history of heart attacks put in the record so as to avoid any personal criticism of the judge in not imposing a death sentence in a case as notorious as this one, and the judge could then say that a death sentence would be pointless since the defendant would not live long enough for the sentence to be carried out; that Reiner told Erbsen he would advise the defendant that, under these circumstances, he should testify; that Reiner had so advised defendant, warning him that either way it was risky, but advising that if defendant did not testify the judge might change his mind and impose a death sentence. At that time Reiner also advised defendant that there were other matters which constituted prejudicial misconduct,— namely, that on December 13, 1967, an adjournment was taken early in the morning; that Reiner returned to the courtroom to retrieve his topcoat and saw the judge, the prosecutor, and investigator in the judge's chambers conversing, but that he (Reiner) had left the courtroom without incident. Reiner neither advised that these matters be made a matter of public record nor made them such. Neither did Erbsen although both were present throughout the trial, at the time of sentence and on motion for new trial. No affidavit of Erbsen is filed with this appeal.

█ No opportunity was given to the trial court to spread on the record the actual fact of the matter. There is, therefore, no indication in the record of misconduct on the part of the trial court as to either of these matters. They cannot be considered on suggestion of counsel in briefs on appeal (*People* v. *Washington*, 71 Cal.2d 1061, 1086 [80 Cal.Rptr. 567, 458 P.2d 479]). It is essential that if a party deems prejudicial an act or statement of the presiding judge that he call the matter to the attention of the judge when the matter occurs so that the error may be corrected. (*People* v. *Sparks*, 257 Cal.App.2d 306, 310 [64 Cal.Rptr. 682].) Reiner, as a former prosecutor, was well aware of this. The contention on appeal that "it was an unlikely prospect that the judge would admit personal misconduct" is untenable. Also untenable is the conclusion of defense counsel on appeal that if this court does not reverse the judgment it tacitly approves the judge's action. There is no record before this court on which this court can make a determination of these charges, and no judicial misconduct appears in the record. The cases cited by defendant dealing with the vice of judicial plea bargaining and coerced pleas are, therefore, not pertinent. As stated by this court in *People* v. *Gilbert*, 25 Cal.2d 422, 443, [154 P.2d 657],

". . . Mere advice and persuasion or the expression of matters of opinion by his own attorney will not suffice to vitiate the plea [of guilty]. Neither will unwarranted or even wilfully false statements of factual matters by his attorney suffice. The private attorney is selected by the party and is his agent. But if the representation of the private attorney presents a purported commitment by a responsible state officer which if actually made would vitiate the plea *and if the acts or statements of such state officer, although innocently done or made, apparently corroborate the representation,* are in good faith and without negligence relied upon by the defendant, and in truth operate to prevent the exercise of his free will and judgment, then the state in its solicitude for fairness will not accept the benefit of a plea so given." (Italics added.) The court below did spread on the record the facts of defendant's heart attack, but this was necessary because of the interruption of the trial by reason thereof. There was no apparent corroboration on which defendant could rely. There was no excuse for not bringing these claims to the attention of the court. In *People* v. *Ang,* 204 Cal.App.2d 553, 556 [22 Cal.Rptr. 455], the attorney for defendant learned on the day of the trial, but before it commenced, that the prosecutor and the judge who were to try the case were in the latter's chambers. The attorney did not mention this until the motion for new trial. There was evidence that the incident in question was no part of the defendant's trial and involved an administrative function of the trial judge. It was held that this did not come within either the letter or spirit of the law which requires the defendant's presence, and that there was no error.

*Extrajudicial inquiries.* At the end of the trial, immediately after sentencing defendant, the court sought to have the record reflect the necessity for the appointment of a co-counsel by showing the volume of medical study and consultation which the defense had to participate in. The court stated: "In fact, Saturday night I happened to be at a dinner at which many men of the medical profession were there and I was amazed [at] the number of men who have been consulted by one side or the other side in connection with insulin in this case. For the first time I learned from these men, *because I, too, had been making inquiries, but I came against a stone wall. Each of them told me, 'I have been consulted by one side or the other and I can't talk to you,'* but last Saturday night for the first time I really learned how many men had been consulted by one side or the other." (Italics added.) Erbsen remarked that he too had been at a social affair where many doctors were present "and one of the doctors said the Court consulted him before I got to him." The court replied "I wanted to learn something about insulin, but Saturday night for the first time I really learned how many men were consulted in this case; so I do know that Mr. Reiner's services were absolutely necessary in this case."

Trial counsel were aware that the court made inquiries on this subject, but they did not assign this as error. Actually the court indicated that it learned nothing as a result of its inquiries. ■ Throughout the trial there was extensive, exhaustive and thorough evidence presented on the subject of insulin, its presence in the body, its cause and effects, and the injection of insulin into the body, its purposes and effects. It was proper for the court to consult textbooks concerning the nature of the properties of insulin, as it is entitled to take judicial notice on its own of the expertise of the doctors testifying at the trial. Evidence Code, section 452, subdivision (h) provides that matters may be judicially noticed which are "(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The comment of the legislative committee to this section states that "[s]ources of 'reasonably indisputable accuracy' include not only treatises, encyclopedias, almanacs, and the like, but also persons learned in the subject matter. This would not mean that reference works would be received in evidence or sent to the jury room. Their use would be limited to consultation by the judge and the parties for the purpose of determining whether or not to take judicial notice and determining the tenor of the matter to be noticed."

■ However we disapprove the action of the trial judge in consulting experts outside of court. While in this instance the facts of the case were not involved, the extrajudicial inquiry by the judge gave no opportunity to counsel to examine or cross-examine the experts with whom he spoke. However lofty the motivation of the judge in his desire to be informed, the interviewing of potential witnesses anywhere but on the witness stand should be avoided. Despite the error in the conduct of the judge, we do not find the error to be prejudicial.

*Two. Was is prejudicial error to admit evidence of three murders which were not charged in the indictment?*

*No.* ■ The evidence was relevant and tended to prove the issues of identity, intent, malice, premeditation, motive, knowledge of the means used to commit the crime, and modus operandi, and was admissible despite its prejudicial effect. (*People* v. *Cramer,* 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Hill,* 66 Cal.2d 536, 556-557 [58 Cal.Rptr. 340, 426 P.2d 908].) ■ It is for the trial court to determine whether the probative value is outweighed by the possible prejudicial effect and to admit or exclude it accordingly. (*People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974].) Evidence Code, section 1101, subdivision (b) provides that "Nothing in this section [character, habit, or custom] prohibits the admission of evidence that a person committed a

crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts." ▮ The remoteness of the evidence usually goes to its weight, not to its admissibility. (*People* v. *Hernandez,* 209 Cal.App.2d 33, 40 [25 Cal.Rptr. 640].) (The remoteness of this evidence is further considered hereinbelow in connection with defendant's claim that he was deprived of a speedy trial and of due process of law.) *People* v. *Kelley,* 66 Cal.2d 232, 240-243 [57 Cal.Rptr. 363, 424 P.2d 947], does not compel a finding of error in the admission of this evidence.

▮ There is no merit in the contention of defendant that until he puts in issue either identity, intent or other fact the People may not anticipate this and present evidence of other acts in their case in chief. It is not necessary for the defendant to raise issues before the People may meet them where this is part of the prosecution's burden. The People have the burden of establishing intent and identity.

▮ *Three. Was defendant denied a speedy trial and due process of law by the pre-indictment delay as to counts I and II?*

*No.* ▮ The Sixth Amendment to the United States Constitution and article I, section 13 of the California Constitution guarantee to an accused the right to a speedy trial. ". . . delay between the date of the offense and the commencement of criminal prosecution is not covered by . . . the Sixth Amendment, but rather it relates to the running of the applicable statute of limitations." (Burger, J., in *Nickens* v. *United States* (1963) 323 F.2d 808, 809 [116 App.D.C. 338].) The statute of limitations is usually considered the primary guarantee against bringing overly stale criminal charges. (*United States* v. *Ewell,* 383 U.S. 116, 122 [15 L.Ed. 2d 627, 632, 86 S.Ct. 773].) ▮ There is no general right to a prosecution speedier than that laid down by the statute of limitations. ▮ One does not become an accused until the filing of a complaint. ▮ The provisions of the Sixth Amendment contemplate a pending charge, not the mere possibility of a criminal charge. (*Parker* v. *United States* (6th Cir. 1958) 252 F.2d 680, 681.) ▮ There is no statute of limitations on murder.

Pre-indictment delay has been the subject of some judicial consideration. *Chapman* v. *United States* (2d Cir. 1967) 376 F.2d 705 requires that the defendant show prejudice or improper motive by the prosecution in delaying an indictment. *United States* v. *Deloney* (7th Cir. 1968) 389 F.2d 324 holds that after such a showing the burden shifts to the People to show that the pre-indictment delay was the result of a valid police purpose. *People* v. *Wilson,* 239 Cal.App.2d 358, 365 [48 Cal.Rptr. 638],

states "It is not improbable that under certain circumstances an accused may be deprived of due process of law, if the lapse of time between the alleged commission of the offense and the filing of the accusation makes it difficult or impossible for the accused to prepare his defense." *People* v. *Gilmore,* 239 Cal.App.2d 125, 129 [48 Cal.Rptr. 449], held that an accused must show two things in order to invoke an exercise of the court's supervisory power because of alleged basic "unfairness" resulting from claimed delay in his arrest: that there was no legitimate reason for the delay, and that he was prejudiced by the delay. Appellant bears the burden of establishing such claim. ■ Post-indictment delay does not require the showing of prejudice: it is presumed. Such a rule would be unworkable if prejudice were presumed in pre-indictment delay.

■ Prejudice in either type of delay may be shown by the loss of a material witness or other missing evidence or fading memory caused by lapse of time. ■ If the government deliberately utilizes delay to strengthen its position by weakening that of the defense or otherwise impairs a defendant's right to a fair trial, an inordinate pre-indictment delay may be shown to be prejudicial. ■ A prosecutor is entitled to reasonable time in which to investigate an offense for the purpose of determining whether a prosecution is warranted and also in preparation of a case for submission to the grand jury. (*Terlikowski* v. *United States* (8th Cir. 1967) 379 F.2d 501, 504-505; *United States* v. *Napue* (7th Cir. 1968) 401 F.2d 107.) ■ The delay must be purposeful, oppressive, and even "smack of deliberate obstruction on the part of the government," before relief will be granted. (*Miller* v. *Rodriguez* (10th Cir. 1967) 373 F.2d 26, 28; *Foley* v. *United States* (8th Cir. 1961) 290 F.2d 562, 566.)

■ The facts and circumstances must be viewed in the light of (1) time involved; (2) who caused the delay; (3) the purposeful aspect of the delay; (4) prejudice to the defendant; and (5) waiver by the defendant. (*Bond* v. *United States* (D.C.App. 1967) 233 A.2d 506, 510-512; *United States* v. *Perez* (7th Cir. 1968) 398 F.2d 658, 660; *Sullivan* v. *State* (1969) 225 Ga. 301 [168 S.E.2d 133, 135].) In *People* v. *Hryciuk* (1967) 36 Ill.2d 500 [224 N.E.2d 250] the court found that the state had all the evidence on a murder charge it would ever have *in 1939,* but made a deliberate election to forego prosecution for this offense until 1953, when a rape conviction was overturned. There was presumed prejudice from the 14-year delay and actual prejudice from the inability of the officers to testify to the circumstances surrounding a confession which the defendant claimed was involuntary.

In *Ross* v. *United States* (1965) 349 F.2d 210, 213-214 [121 App. D.C. 233], prejudice resulted from the fact that the sole prosecution wit-

ness testified not from personal recollection but only with the aid of his official notebook, the sole means of identification and prosecution of dozens of alleged narcotics offenders. The instant case is more comparable to the situation in *United States* v. *Feinberg* (2d Cir. 1967) 383 F.2d 60, 64, 67, where there was a five-year delay between the offense and the indictment, and this was held not to constitute a denial of due process. There the defendant was given every opportunity to demonstrate prejudice, but was only able to point to isolated incidents of diminished recall not dealing with essential matters in dispute. He was able to testify with specificity as to the events in question and unequivocally to deny his complicity in the crime. The offense was immediately investigated. His recollection was assisted by various documents in evidence. The record disclosed no failure by defendant to reconstruct what he did not remember. The court held that until prejudice has been shown by the defendant there should be no inquiry into the reason for the delay. In *United States* v. *Ewell, supra,* 383 U.S. 116, 120 [15 L.Ed.2d 627, 630], it was held that it would be unwise to impose upon the courts the inquisitorial function of scrutinizing the internal operations of law enforcement agencies when no possible prejudice to the accused has been shown.

 It is proper for the trial court to wait to appraise the reasonableness of the delay in light of what would be disclosed at and after the trial, which places him in an excellent position to rule on a renewed motion. (*United States* v. *Napue* (7th Cir. 1968) *supra,* 401 F.2d 107, 114.) That is what the court did here. Although it did make a comment that there must have been some prejudice to defendant because of the delay, it reserved its ruling until the end of the trial. No showing was made by the defendant at the trial that any crucial defense was lost by reason of the delay. The prosecution located any material witnesses requested by defendant or stipulated as to what the testimony would be. The prosecution produced evidence to show that there was a reasonable investigation which commenced with the murder of Zella Archerd and continued until the scientific breakthrough occurred which could form the foundation for a successful investigation and prosecution to alter all of the medical opinions which had previously thwarted prosecution.

At the time of the murder of Zella in 1956, the police suspected defendant of murder but they were unable to prove it, because at that time all of the medical authority was of the opinion that the cause of death could not be established as due to a criminal agency. They relied on the local coroner's report. They knew they had to establish a corpus delicti before any charges could be filed. Insulin was suspected as the murder weapon. The attending physician could not find any indication of a functional islet cell tumor in his examination of her pancreas; he found no type of organic

or pathological disease or disorder which could have been the primary cause of death; and he was unable to find a criminal agency as of the cause of death. He told the police that they were unable to isolate insulin in the body inasmuch as it was a body secretion, and that to their knowledge there were no tests where they could show insulin injection. At that time there were no immunochemical tests available to determine insulin levels from a sample of blood. In 1958 an article appeared in the British Medical Journal regarding the death of a woman from insulin injected by her male nurse husband, in which the doctors used a test involving injecting material from the decedent into a mouse. No test was developed by which insulin levels could be determined from a sample of blood without first injecting it into a mouse until 1960; and modifications were made in this test in 1963 and 1967 by Dr. Edward Robert Arquilla, one of the experts at the trial. It was not until after a succession of murders in which this defendant was suspect and in which the police after painstaking investigation were unable to discover eyewitnesses to any injections or to obtain medical reports showing a criminal agency as a cause of death, that the investigating officers, with the aid of a special assistant assigned to them by the district attorney, changed the course of their investigation. They determined to find a method of detecting insulin in the body by medical tests and research techniques. In 1967 the coroner's office was not able to perform these tests. In attempting to discover how the blood and tissues could be prepared for possible future death, they contacted Eli Lilly Laboratories and were informed of Dr. Edward Arquilla, then unknown to them. Dr. Arquilla is a pathologist and a professor of pathology at U.C.L.A. He had published over 35 papers on insulin in its immunological activity and biological action; he is extremely active in organizations, conferences and research devoted to diabetes and insulin; and he worked in conjunction with Dr. Robert E. Tranquada. Dr. Tranquada is a specialist in internal medicine with a sub-specialty in diabetes and hypoglycemia; he has been on the teaching faculty of the U.S.C. School of Medicine teaching and investigating diabetes and hypoglycemia; he has numerous publications in this field, and four on hypoglycemia; and during the past 10 years he has investigated possible hypoglycemia in patients at the Los Angeles County Hospital. The particular research project in which Dr. Arquilla was engaged in which insulin is removed from the body and injected into mice, was not a published procedure until 1963. At the time of Zella's death there would have been only a few laboratories that could have done the necessary examination, and the tissue would have had to be properly prepared, so that it would have been most unusual to afford a determination of hypoglycemia due to injection of exogeneous insulin. At the time of Burney's death in 1961 there were only two laboratories performing these

tests as a routine matter and they were both located in New York. Moreover, at the time of his death the insulin in his body would have dissimilated itself, and none of the insulin injected on August 21, 23 and 26 could have been detected by a test after his death on his blood or by the mouse injection test. Had samples been sent to the two laboratories that were performing the tests there were no precedent tests for comparison on the results. At the time of Burney's death it could only be based upon individuals receiving insulin for therapy of diabetes which had significantly different magnitudes of insulin.

In January 1967, Lt. White learned from Dr. Arquilla of the various types of hypoglycemia, and of the type of brain damage shown on the brain slides of Burney and Mary Archerd. For the first time Lt. White became aware that proof of criminal agency did not depend upon an actual observation of the injection of insulin, and learned of the importance of prior symptoms in other forms of hypoglycemia. He interviewed relatives, friends and neighbors of each of the victims and had them personally interviewed by Dr. Tranquada. Reinterviews were made with attending physicians, autopsy physicians and neurosurgeons previously associated with the case, and the doctors were brought together to consult and discuss their various functions concerning the deaths of the victims. Reviews were made of hospital records and autopsy records with the additional factors of the prior health history and lack of symptoms of hypoglycemia in life, or symptoms of endogenous hypoglycemia at death. It would be unduly burdensome and unnecessary to relate all of the steps taken by the prosecution to locate witnesses. This matter is thoroughly spread on the record, and the reasons for the delay in obtaining an indictment and the claimed prejudicial effect upon the defendant were thoroughly argued. The delay was neither unreasonable, arbitrary, oppressive or vexatious and was not deliberately caused to harass defendant. No grounds for reversal are shown by the preindictment delay. Anyone who seeks on appeal to predicate a reversal of conviction on error must show that it was prejudicial. (Cal. Const., art. VI, § 13.)

 *Four. Did the trial court misconstrue and misapply the law in passing sentence on the defendant?*

*No.* Certain remarks made by the judge at the time of sentencing are claimed by defendant to be a statement that the judge was not exercising his discretion in giving the death penalty but felt impelled by the law to do so. If this were the true import of the judge's words a serious question would be presented. His words speak for themselves, however, and indicate only that the judge was aware of the responsibility placed by the law upon him, that the penalty of life or death was in his discretion, that he thought this

was the most aggravated murder case of all time, that aggravation was a proper consideration, since the Legislature provided for the death penalty, but that the law did not require such a penalty.[1] The decision was his to

[1] "The Court: Gentlemen, I appreciate the fact that the sentence in this case is my responsibility, my responsibility alone. Nobody can share that with me.

"I was interested in this heart condition for one reason. I did not want to place the State in the immoral position where it was racing with this man's God to claim his body. I did not think that that was a moral position to take at all.

"I agree with you, Mr. Erbsen, times have changed. The majority of states now have done away with capital punishment. The Federal Government may have done away with capital punishment. But can a Judge on the trial level do away with capital punishment?

"I hate that penalty as much as anybody. But it is on the books. And I have taken an oath that I will support the Constitution and I will obey the laws.

"Now the Penal Code provides, and the Legislature provides, that one found guilty of murder of the first degree will suffer either the death penalty or life imprisonment.

"The Legislature must have had some reason for the alternate sentences, and I can only assume that in the aggravated cases the Legislature intended that the death penalty be imposed.

"If ever there was an aggravated case, this is it.

"(Omission-discussing other cases). . . . But then it was my misfortune to meet Mr. Archerd. And I think he is more evil than any I have ever seen before.

"It is a very, very difficult thing, to tell a man, 'You must die.' I certainly derive no pleasure in doing so. I would prefer the other.

"But, if I would prefer the other in this case, I would be doing a cowardly thing, it would be a cowardly act not to impose the death penalty in this case.

"I have given this a great deal of thought. I can tell you frankly the past few nights I have not slept, not because my conscience was bothering me, but because I was dealing with the life of a human being. Regardless of what he did, he is still a human being, and it is a difficult thing to take the life of a human being. It is a difficult thing to tell a human being, 'You must die.'

"Gentlemen, I feel in this case it is my sworn duty to do so.

"For each of the counts set forth in the indictment, for which this defendant was found guilty of murder in the first degree, the Court determines that he shall suffer the death penalty."

Court adjourned, reconvened later for imposition of sentence and motion for new trial. At the latter hearing the court made the following remarks in response to a defense motion for reduction of sentence to life imprisonment:

"Well, Mr. Erbsen, I am not a great believer in the death penalty. Frankly, I do not feel it is much of a deterrent. I think you know I have prosecuted people who murdered children, some while molesting them. They were put to death. I requested the jury to give the death penalty; the death penalty was executed, and yet we still have these people molesting children.

"I prosecuted people who murdered in the course of burglaries and robberies and I asked the death penalty and got the death penalty, and they were executed; and we still have people murdering and robbing and killing, so I am not a great believer in the death penalty.

"But, I feel this way: In the books we have either life or death in the discretion of the jury or of the Court, whoever tries the case, so there must be a reason for the death penalty and there must be a reason for life imprisonment. If ever there was an aggravated offense or offenses, this is the case; and if ever a case demanded the death penalty as opposed to life imprisonment, this is the case.

"The only reason I said that this defendant must suffer the death penalty is be-

make, he did not like to impose the death penalty, but he had to live up to his oath of office to consider both penalties, and to impose death if he thought it should be imposed.

The judgments of conviction and the sentences of death are affirmed.

Peters J., Acting C. J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Roth, J.,* concurred.

---

cause it is on the books and it is against my conscience to do so, but I have sworn to uphold the law and because of my oath to uphold the law I must impose that sentence. . . ."

*Assigned by the Acting Chairman of the Judicial Council.