[No. A045610. First Dist., Div. Two. Apr. 4, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MOALA NGAUE, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication. The portions to be published follow.

1116

COUNSEL

Moala Ngaue, in pro. per., and Linda Robertson for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, and Sharon Birenbaum, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Moala Ngaue appeals from convictions of two counts of attempted voluntary manslaughter and two counts of robbery. He contends the trial court erred in denying his repeated motions for substitution of his appointed counsel, denying his request for a continuance after granting his motion to represent himself at trial, denying his request for appointment of counsel to represent him in a motion for new trial, and compelling him to rest without enabling him to recall one of the victims as a witness. He further claims the trial court erred in imposing consecutive sentences on the robbery and attempted voluntary manslaughter counts, imposing consecutive sentence enhancements for gun use, imposing a three-year enhancement for infliction of great bodily injury in connection with the subordinate term sentence on a robbery count, and giving an inadequate and confusing statement of reasons for its sentence choices.

## STATEMENT OF THE CASE

On April 22, 1988, an information was filed in the San Mateo County Superior Court charging appellant with the attempted murders (Pen. Code, § 664/187) and robberies (Pen. Code, §§ 211) of Abed Rabah and Ali Negem. It was further alleged that in the commission of these offenses appellant personally inflicted great bodily injury upon the victims within the meaning of Penal Code sections 12022.7 and 1203.075, subdivision (a), and personally used a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1), and that appellant had served two prior prison terms within the meaning of Penal Code section 667.5,

subdivision (b). An amended information filed on January 30, 1989, altered the language of the attempted murder counts to add that they were committed deliberately and with premeditation.

Appellant made a total of five motions for substitution of his attorney, which were denied by two different judges. The last two of these were combined with requests that appellant be allowed to represent himself if the motions for substitution of counsel were not granted. These motions were also denied. A final motion for self-representation was granted by the judge to whom the case had been assigned for trial on January 30, 1989, the first day of trial.

After a one-week continuance, jury trial began on February 6. On February 14, the jury reached verdicts of not guilty on the counts of attempted murder but guilty on two counts of the lesser included offense of attempted voluntary manslaughter and two counts of robbery; it further found the firearm use, infliction of great bodily injury and prior prison term allegations true. The jury was then presented with evidence of the charged prior convictions and prison terms and found them true.

Appellant requested a new trial and appointment of an attorney to assist him in a new trial motion and at sentencing; ruling on this request was deferred and appellant's motion for a new trial was later denied at the sentencing hearing. Appellant was sentenced to a total prison term of 17 years and 2 months. He filed a timely notice of appeal on April 10, 1989.

## STATEMENT OF FACTS

Abed Elsalam Rabah owned the Hi and Bye Market on University Avenue in East Palo Alto. On the night of November 27, 1987, Rabah and Ali Negem were working in the store. Both recalled that appellant came into the store three or four times that night, the first somewhere between 8 and 10 p.m., and each time bought a bottle of wine or a bottle of wine and a bottle of beer. Negem waited on appellant each time. Until appellant's last visit to the store, Negem was behind the counter and Rabah was circulating around the store.

The last time appellant came into the store, about 12:30 or 12:35 a.m., both Negem and Rabah were behind the counter; Rabah was preparing paperwork and had his back to the counter. Appellant brought a small orange wine cooler to the counter and Negem put it in a small bag, rang up the purchase, and asked for a dollar. Appellant reached behind his back as though to get a wallet from his pocket but instead pulled out a small silver gun, pointed it at Negem and told Negem to open the cash register and give

him the money. Hearing this, Rabah turned around; appellant pointed the gun at him and told him to open the other cash register and take all the money out. Both Negem and Rabah opened the registers immediately and put the money on the counter. Negem testified that appellant asked for a paper bag and Negem got one, put the money in it and handed it to appellant; Rabah could not remember who put the money in the bag but thought it was Negem, and testified that appellant grabbed the bag. Appellant also demanded that Negem and Rabah empty their pockets; Negem had $20 and his home keys, which appellant put into the bag with the money, and Rabah had nothing.

After taking the bag, appellant told Rabah " 'You guys must have a gun. Give me the gun you have.' " Rabah said they did not have a gun, and appellant immediately shot Rabah twice in the right shoulder and once in his left hand. Appellant turned to Negem, who grabbed appellant's hand; Negem was shot through the bottom of his stomach and his left leg then turned appellant's hand away so that a second shot hit the counter. Rabah pulled out a .357 magnum and fired six shots at appellant, at which time Negem let go of appellant's hand and fell to the ground behind the counter. Rabah thought he hit appellant but could not remember. When Negem fell, he saw appellant fall and thought he saw some blood on appellant's back, then saw appellant get up and run away. As Negem and appellant were struggling, everything on the counter, including the cash register drawers and wine and beer, fell on the floor; when Rabah shot appellant, the bag with the money and the wine fell on the floor.

Rabah followed appellant out of the store with a shotgun kept behind the counter, chased him for two blocks and saw him go behind a small pick-up truck. Rabah told him not to move, saw him start loading his pistol and asked if appellant was going to shoot him again. Appellant started to run down the street and Rabah fired the shotgun, which "reared back" and hit him in the face.

The police arrived and Rabah gave them a description of appellant, including a tattoo on the left side of his neck which Rabah identified on appellant at trial. Rabah was taken to the hospital; he had surgery to remove one bullet and another remained in his body. Back at the store, someone called the police and Negem told them what had happened. Negem also recalled the tattoo on appellant's neck and identified it at trial. Negem was taken to the hospital and had surgery to remove a bullet from his leg.

Police officer Renaldo Rhodes received a call about a possible robbery at the Hi and Bye Market at about 12:43 on the morning of November 28,

arrived there three to four minutes later and found officer Christopher Samuels outside. They entered and found the store in disarray, with money on the floor. Negem gave a quick description of the suspect, which Rhodes broadcast, and was then taken by ambulance to the hospital. Other officers found Rabah, called paramedics and took custody of Rabah's shotgun. Officer Frank Churchill[1] took photographs of the store which were produced at trial; he testified that he saw broken beverages, paper bags, currency and expended shell casings from a .25-caliber weapon on the floor and that a bullet fragment lodged in the wall above the coolers appeared to be larger than a .25-caliber. Samuels, in charge of collecting evidence at the store, seized $346.02 in cash which was scattered on the floor near the front door, two bags containing $17 and $342 respectively, a spent bullet shell on the floor, six spent .38 bullet shells inside a .357-caliber handgun on the floor. Samuels recalled a broken bottle of alcoholic beverage on the floor and testified that the police photographs accurately depicted the scene as he found it.

Detective Rod Lamour took photographs of bullet holes in the Hi and Bye Market on December 11, 1987. Three holes—one in the window behind the counter at chest level, one on the deli case next to the counter which appeared to be a ricochet, and one toward the rear of the store about eight to nine feet off the ground—were from a .25-caliber gun. Several others, mostly in the area of a cooler, were from a .38-caliber weapon.

On March 28, 1988, Redwood City Police Sergeant Michael Manry went to the Mayfair Hotel looking for appellant. When he found appellant, identified himself and told appellant not to move, appellant asked " 'is this for the robbery?' " Nothing had been said about a robbery before this comment.

*Defense case*

Appellant called a number of witnesses who described aggressiveness on the part of the store owner and workers. Several customers testified that they had been beaten or chased from the store at gunpoint by the store owner and employees, or had seen others subjected to such treatment. The owner of the business next door additionally described having seen Rabah "sic" a dog on people, having been personally threatened by him and having complained about him to city officials and the police.

Recalled to the stand by appellant, Rabah testified that the whole shooting incident took about three seconds and he did not remember whether Negem had been shot before Rabah pulled his gun; he denied the above

---

[1] Churchill testified as appellant's first witness.

accusations regarding his conduct but admitted that he had defended himself in incidents. On examination by the district attorney, Rabah testified that he had a bad relationship with the next door store owner, who he said sold drug paraphernalia and brought bad elements to the neighborhood, but denied having threatened her or used his dog to intimidate anyone.

Appellant testified that he had sold drugs in the past and had a prior felony for sale of cocaine. During Thanksgiving week of 1987 he had come from Los Angeles for a church "camp" in San Carlos with his sister and brother-in-law, who wanted to take him away from the drugs and street life. On Friday, November 27, appellant and one of his cousins from Hayward went to a bar in East Palo Alto. Appellant had never been to East Palo Alto before.

During the evening, appellant went to Rabah's store three or four times to buy drinks for "Tongan kids" outside the bar. He eventually gave a .25-caliber automatic gun he was carrying to a "Tongan kid" at the bar who had been pestering him for it. The kid later told appellant he had sold the gun to people at the store where appellant had been buying beer.

Appellant, upset, went to the store, but the two men there said no one had sold them a gun; after checking that he had the right store, appellant returned, told Rabah he had his gun and offered to return the $20. The two began to argue, then Negem came up from behind appellant and pointed appellant's gun in his face, repeating "you want gun? You want gun?" and jabbing appellant in the face. Appellant hit the gun out of his face and it went off, temporarily blurring appellant's vision. Appellant grabbed Negem's hand and the two struggled, during which time the gun went off three or four times. Appellant flipped Negem to the side of the counter, where Negem fell and got shot. Rabah and a third person appellant claimed was behind the counter pointed guns at appellant; appellant was shot in the shoulder and fell, then ran for the door, felt something hit him in the head and heard gunshots from behind the counter. Appellant ran from the store, stopping because of dizziness from the blow to his head; Rabah followed and shot at him with a .357. Appellant passed out and when he awoke managed to walk slowly to a street where a Tongan kid picked him up and told him someone had died at the store. Scared to go to a hospital in the area because he did not want to be held responsible for the death, appellant eventually had relatives call his family in Los Angeles and a sister flew in and took him to a hospital in Monterey where he used a false name.

Appellant found out a month and a half later that no one had died. When he was arrested, he asked whether it was for the robbery because he had been told the police had been looking for a Tongan named Moala with a

tattoo on his neck. Appellant testified that Rabah and Negem were lying about the entire incident, that he never demanded money from them, shot them after demanding their guns or tried to rob them, and that the only reason he was the suspect in the case and Rabah and Negem the victims was that they went to the police and he did not.

DISCUSSION

I.*

. . . . . . . . . . . . . . . . . . . . .

E. *Appointment of Counsel for New Trial Motion*

At the conclusion of his trial, appellant asked the court to waive time for sentencing so he could prepare an appeal and to appoint a lawyer to file a "retrial" motion for him. Judge DeLarios explained that appellant could not appeal until after sentencing and asked appellant to file his motions in writing, providing some authority which would be considered either by the trial judge or the criminal presiding judge. With respect to the request for counsel, the judge told appellant he had had the help of a lawyer for 10 months and deferred ruling, again telling appellant to submit memoranda on the issue.[10] Appellant filed no memoranda.

On March 20, appellant's case came on for sentencing before Judge DeLarios. Appellant wanted to question Keyes about his pro per status but the court told him his motion for self-representation had been granted and was not going to be reconsidered. Appellant made a lengthy statement regarding his dissatisfaction with Keyes and not having wanted to represent himself, then asked for a 60-day continuance and a court-appointed attorney to advise him on sentencing procedure and assist him in the preparation of a new trial motion, promising to work with any lawyer other than Keyes.[11] Appellant further stated that he did not have access to a law

---

*See footnote, *ante,* page 1115.

[10] The judge's remarks indicate some irritation with appellant: "We'll assume your motion has been made. It has been made, but you support it with some authority, or some kind of memoranda, some kind of argument, something that indicates you should have. So that if you decide you want one, then later on you don't want one, the judge will know what to do about it. All right. But you give some reasons for it, other than you want one now. [¶] You had one of the best lawyers on the private defender panel. You had the advantage of two investigators, then you had the guts to tell the jury you only had a week to prepare your case, which was kind of dirty pool."

[11] Respondent suggests that appellant may have been asking only for advisory counsel to assist him while he represented himself. While appellant used the terms "advise" and "as-

library, had not gotten assistance on writing a new trial motion and did not "know the first thing about points and authorities." The court told appellant none of the statutory grounds for a new trial were present in the case and denied the motion for new trial. With respect to the motion for appointment of counsel, there was some discussion of Judge Kemp having told appellant before trial that he could either represent himself or accept representation from Keyes[12] and Judge DeLarios stated that appellant's motion had previously been denied.

Appellant's contention that the trial court erred in denying his request for appointment of counsel to make a motion for a new trial is based on *Menefield* v. *Borg* (9th Cir. 1989) 881 F.2d 696. In that case, a defendant who had represented himself at trial later requested appointment of counsel to assist in the preparation of a new trial motion; the request was denied and the defendant obtained habeas corpus relief from the Ninth Circuit Court of Appeals. The court first determined that under California law a motion for a new trial is a critical stage of the prosecution at which a defendant has a right to counsel under the Sixth Amendment to the United States Constitution. (*Id.*, at pp. 698-699.) Although recognizing that the right to counsel is not absolute after it has been waived, the court stated a strong presumption that a post-trial request for counsel should not be refused. (*Id.*, at p. 700.) The court noted that there are times when defendants should not be allowed to change course and insist on counsel at the last minute, as when they seek continuances on the eve of trial for purposes of delay. (*Ibid.*) While delay immediately before trial carries a significant threat of disruption for the court and witnesses, however, the court felt it unlikely that a continuance after the verdict would substantially interfere with the court or parties. (*Id.*, at pp. 700-701.) "[T]he hearing on a post-trial motion is generally a brief affair, lasting substantially less than a day. Rescheduling such a hearing— more likely than not—will not involve a significant disruption of court scheduling. While we are aware that as a general matter it may be more efficient to have the motion for a new trial presented when the issue is fresh in the minds of the parties and court, that is an insufficient interest to warrant denying defendants the assistance of counsel. We therefore hold

sist," his request must be viewed in context. Appellant had made numerous attempts to substitute counsel and, when these were unsuccessful, tried several times to represent himself as the only alternative to proceeding with Keyes. None of his motions were coupled with requests for advisory counsel or give any reason to suspect appellant considered this a possibility. In the request at issue, appellant told the court "it was only with the utmost reluctance that I became pro per." His remarks indicate that appellant was seeking to change his status and be represented by counsel rather than to have advisory counsel assist him in representing himself.

[12]After Judge Bible had granted appellant's *Faretta* motion (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]) and a one-week continuance on January 30 and 31, Judge Kemp had denied a further motion for continuance at another hearing on January 31 and confirmed the trial date of February 6.

that, at least in the absence of extraordinary circumstances, an accused who requests an attorney at the time of a motion for a new trial is entitled to have one appointed, unless the government can show that the request is made for a bad faith purpose." (*Id.*, at p. 701.) Since the record in *Menefield* did not indicate any improper purpose, and the trial court had denied the request not because it was made in bad faith but because appointment of counsel would have required a continuance, the court granted relief. (*Ibid.*)

*Menefield* in effect holds that a defendant should be allowed to withdraw a *Faretta* waiver in circumstances substantially identical to those presented here. Though decisions of the federal courts are entitled to great weight, we hesitate to follow *Menefield* because in a related context our state Supreme Court has allowed trial courts greater discretion than have the federal courts. In *People* v. *Burton* (1989) 48 Cal.3d 843, 852 [258 Cal.Rptr. 184, 771 P.2d 1270] the court considered the issue of timeliness of a *Faretta* motion, holding that since the right to self-representation is unconditional only if asserted " 'within a reasonable time prior to the commencement of trial,' " a *Faretta* motion made after both counsel had answered ready and the case had been transferred for trial was directed to the trial court's discretion. *Burton* declined to follow the federal rule that a motion for self-representation is timely as a matter of law if made before the jury is impaneled and must be granted unless shown to have been made for the purpose of delay. (*Id.*, at pp. 853-854.) The court noted that the federal rule was in practice similar to the California one, as it would allow denial of a *Faretta* motion before the jury was impaneled if the motion was made for the purpose of delay and the need for a continuance could be evidence of dilatory intent. The federal rule differed, however, in that California put the burden on the defendant to explain the delay when making a late motion. (*Id.*, at p. 854.) The court concluded, "To the extent that there is a difference between the federal rule and the California rule, we find the federal rule too rigid in circumscribing the discretion of the trial court and adhere to the California rule." (*Id.*, at p. 854.) Though it is not precisely on point, *Burton* thus suggests the *Menefield* principle that counsel must be appointed to assist in a new trial motion unless the prosecution can prove an improper motive for the request would not be accepted by our state Supreme Court, which would vest greater discretion in the trial court.

 While no California case has addressed the specific question of withdrawal of a *Faretta* waiver *after* trial, such a withdrawal *during* trial is a matter for trial court discretion. (*People* v. *Hill* [1983] 148 Cal.App.3d [744] at pp. 760-761; *People* v. *Cruz* [1978] 83 Cal.App.3d [308] at p. 319; *People* v. *Elliott* (1977) 70 Cal.App.3d 984, 991-994 [139 Cal.Rptr. 205].) Under California authority, a judge confronted with a defendant's request to withdraw a *Faretta* waiver during trial should consider, among other factors,

" '(1) [the] defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.' " (*People* v. *Hill, supra,* 148 Cal.App.3d at p. 760, quoting *People* v. *Elliott, supra,* 70 Cal.App.3d at pp. 993-994; *People* v. *Cruz, supra,* 83 Cal.App.3d at pp. 319-320.)

*Elliott, Cruz* and *Hill* found abuses of discretion in trial courts' denials of requests to reinstate counsel during trial—in *Elliott,* after jury selection, in *Cruz* on the date set for trial, in *Hill* immediately before jury selection. These cases noted that the requests came at early stages of the trial and would not have required lengthy continuances or prejudiced the prosecution, and found improper the trial courts' denial of the motions on the basis that continuances would be necessary. (*Hill, supra,* 148 Cal.App.3d at p. 761; *Cruz, supra,* 83 Cal.App.3d at pp. 320-321; *Elliott, supra,* 70 Cal.3d at pp. 996-998.) *Cruz* and *Elliott* specifically noted that the defendants' reasons for requesting counsel—recognition that they could not compete with the prosecutors—were valid and that the defendants were not likely to be as effective in defending themselves as an attorney would be. (*Cruz, supra,* 83 Cal.App.3d at p. 320; *Elliott, supra,* 70 Cal.App.3d at p. 996.)[13]

Application of these principles to the present case suggests counsel should have been appointed unless appellant was seeking representation for an improper purpose such as delay: Since he had already been convicted, granting appellant's request would cause less disruption than that considered acceptable in *Hill, Cruz* and *Elliott* (see *Menefield* v. *Borg, supra,* 881 F.2d at p. 701); the fact that appellant had made numerous requests for substitution before trial would not necessarily indicate that his request after "the unsettling experience of trial" (*Menefield* v. *Borg, supra,* 881 F.2d at p. 701) was for an improper motive, and appellant clearly could not effectively represent himself at this stage of the proceeding.

Indeed, as a practical matter, consideration of the factors identified in *Hill, Cruz,* and *Elliott* in the posttrial context yields a result very similar to

---

[13] *Hill* and *Cruz* also involved the fact that the defendants' initial *Faretta* waivers had been found invalid because they were tainted by the trial courts having improperly denied *Marsden* (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) motions. (*Hill, supra,* 148 Cal.App.3d at p. 760; *Cruz, supra,* 83 Cal.App.3d at p. 318.) While the present case differs in that the denial of appellant's *Marsden* motions was proper, this was not the determinative factor in those courts' analyses. *Elliott,* like the present case, did not involve any question of the initial *Faretta* motion being invalid but only of a defendant who had waived his right to counsel later seeking to retract that waiver.

that reached in *Menefield*. While the California test is discretionary, *Menefield* describes why most of the factors considered in the California cases would militate in favor of appointment at this stage. On the other hand, even under *Menefield*, the trial court retains discretion to deny a request for posttrial assistance of counsel where the request is made for a bad faith purpose, and factors such as the defendant's history in substitution of attorneys or purpose to delay further proceedings may bear on the determination whether such a bad faith purpose exists. (See 881 F.2d at pp. 700-701.) Rather than imposing upon the prosecution the burden of demonstrating an improper motive for the request for counsel, however, we view the defendant's motive in requesting to withdraw a *Faretta* waiver as one of the factors for the trial court to consider in exercising its discretion; clearly, a finding that the request was made for an improper purpose such as delay would militate against granting the request.[14]

In the present case, the trial court never ruled on appellant's posttrial request for counsel; it simply denied his motion for a new trial on the merits. The court's statement that appellant's *pretrial* motion had previously been denied by Judge Kemp simply did not address the motion for appointment of counsel to assist with a motion for new trial. This was error.

Appellant urges that an erroneous denial of his request for appointment of counsel requires automatic reversal of the tainted proceeding. In *Menefield*, the Ninth Circuit applied the rule that Sixth Amendment violations pervading trial require automatic reversal to the situation before it, where erroneous denial of the request for counsel on a new trial motion pervaded a postconviction hearing. (881 F.2d at p. 701, fn. 7.) ██ By contrast, several California Courts of Appeal have employed a harmless error analysis in determining whether a trial court's denial of a request to retract a *Faretta* waiver was prejudicial. (*People v. Sampson* (1987) 191 Cal.App.3d 1409, 1418 [237 Cal.Rptr. 100]; *People v. Hill, supra*, 148 Cal.App.3d at p. 762; *People v. Elliott, supra*, 70 Cal.App.3d at p. 998.) As explained by the court in *Elliott*, "[s]ince defendant has exercised his constitutional right of self-representation, an abuse-of-discretion error in not

---

[14] Respondent makes much of the fact that appellant did not file memoranda in support of his motion for appointment of counsel as directed by the trial court. Appellant's argument that he was unable to do so because he did not have access to a law library may be cast in doubt by the fact that he filed at least two written motions before trial, for a continuance and to exclude use of prior convictions for impeachment purposes. As the issue was never developed in the trial court, the record before us does not permit any conclusions as to whether appellant could or should have filed such memoranda, but we caution that his failure to do so would appear an insufficient reason to deny him representation unless that failure indicated an improper purpose in making his motion. Appellant's failure to file written memoranda was clearly not the basis of the trial court's decision to deny his new trial motion, as it was never mentioned by the court.

permitting defendant to change his mind does not appear to us to be of constitutional dimension." (70 Cal.App.3d at p. 998.) We agree with these latter cases.

■ The trial court's erroneous refusal to rule on appellant's posttrial motion for assistance of counsel must be viewed as harmless. Appellant claims the record indicates the possible existence of grounds for a new trial motion in that the court's forcing appellant to rest without recalling Negem to the stand and refusing to grant appellant a continuance could have been raised as errors in the decision of a question of law arising during the trial (Pen. Code, § 1181, subd. 5) and an attorney could have obtained medical testimony which, if favorable, could have constituted newly discovered evidence. (Pen. Code, § 1181, subd. 8.) We have already determined that the court's denial of appellant's motion for a continuance was proper and, as will be explained in the next section of this opinion, will determine that the court committed no error in concluding the case when it did. As for the possibility of medical testimony, a party is entitled to a new trial on the ground of newly discovered evidence only if certain conditions are met, including that the evidence be such as to render a different result probable on retrial. (*People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203].) As has been discussed, the medical evidence appellant sought to investigate in this case was speculative, of marginal relevance, and extremely unlikely to affect the outcome of his case. Accordingly, it is not reasonably probable that the trial court would have granted a new trial motion on this ground. As for appellant's suggestion that new counsel might have perceived additional grounds for a new trial motion, it is appellant's burden to show prejudice on appeal (*People* v. *Archerd* (1970) 3 Cal.3d 615, 643 [91 Cal.Rptr. 397, 477 P.2d 421]) and his speculative contentions fail to sustain this burden.

More persuasive is appellant's contention that, entirely apart from the new trial motion, counsel would have been able to assist at sentencing either by arguing for a lesser sentence or by raising the claims of error addressed in later portions of this opinion. As discussed in unpublished portions of this opinion, appellant's claims that he should not have been sentenced separately on the robbery and attempted manslaughter counts or given two weapon-use enhancements present questions on which reasonable minds can differ. Clearly, the trial judge could properly have imposed the different sentence appellant now claims should have been given. Counsel might have made a difference. Accordingly, it is necessary to remand for a ruling on appellant's motion for appointment of counsel. If the motion is granted, the court shall hold a new sentencing hearing; if it is denied, the judgment shall be reinstated (*Menefield* v. *Borg, supra,* 881 F.2d at p. 701, fn. 7; *People* v. *Winbush* (1988) 205 Cal.App.3d 987, 992 [252 Cal.Rptr. 722]), subject to

the modifications of sentence specified in sections III-B and III-C, *post* (nonpublished portion).

## II.*

. . . . . . . . . . . . . . . . . . . .

## CONCLUSION

The matter is remanded to the trial court for a hearing on appellant's request for appointment of an attorney to assist him at sentencing and, if this request is granted, a new sentencing hearing in accordance with the views expressed herein. If the request for counsel is denied, the judgment shall be reinstated subject to modifications that one enhancement under Penal Code section 12022.5 must be stricken and the Penal Code section 12022.7 enhancement appended to count 3 must be reduced to one year.

Smith, J., concurred.

**BENSON, J.,** Concurring and Dissenting.—I dissent only to that portion of the majority opinion which remands to the trial court for the purpose of conducting a hearing on appellant's motion for appointment of counsel to assist in sentencing. In my judgment the motion was heard by the trial court, considered, and judicial discretion properly exercised in denying appellant's request.

While I might be more sympathetic to a convicted in propria persona criminal defendant who unconditionally seeks the guidance of counsel in the complicated area of posttrial sentencing, that is not the situation before this court. Here request for assistance was conditioned on the court appointment of any lawyer other than Richard Keyes.[1] In effect appellant is asserting a veto over the court's discretionary power to appoint counsel, an incursion which cannot be condoned.

The record provides no basis, in law or fact, justifying appellant's arbitrary, whimsical rejection of attorney Keyes as counsel to assist on posttrial sentencing issues. On five separate occasions appellant's *Marsden* challenges

---

*See footnote, *ante*, page 1115.

[1] The statement to Judge DeLarios is as follows: "I'm not making new trial motion here today. I'm requesting 60 days continuance and court appoint me a lawyer to advise me on the sentencing procedure and to assist me in the new trial motion. *I promise that I will work with any lawyer that the court appointments* [sic] *other than Richard Keyes*, and I point out to the court that it was only with the utmost reluctance that I became pro per." (Italics added.)

to the adequacy of Keyes representation were heard by the trial court and rejected. (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Indeed, at the fourth *Marsden* hearing appellant acknowledged "he had been trying to get rid of his lawyer 'not because he was incompetent' but because appellant felt he was not interested in the case and had done nothing to help gain confidence in him." Whatever imagined shortcomings appellant may have perceived with respect to Keyes's representation before and during trial certainly were not germane to Keyes's ability to provide legal assistance on sentencing issues.

Keyes' knowledge of the case, acquired during his trial preparation over a 10-month span would have provided valuable insight on the sentencing issues to appellant's benefit. On the other hand, appointment of new counsel would substantially increase the time and cost required to fully educate a lawyer unfamiliar with the proceeding. I see no good reason why the taxpayers should be required to subsidize a proceeding occasioned by appellant's fanciful intransigence.

Appellant's petition for review by the Supreme Court was denied June 27, 1991. Kennard, J., was of the opinion that the petition should be granted.