Filed 3/30/22  P. v. Coleman CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>WENDELL COLEMAN, JR.,<br><br>        Defendant and Appellant. | A161731<br><br>(Napa County<br>Super. Ct. No.<br>CR183654) |

Defendant Wendell Coleman, Jr., appeals from a judgment following a contested probation revocation hearing and imposition of a four-year prison sentence for corporal injury to a spouse, false imprisonment by violence, and two /counts of disobeying a domestic relations court order.  On appeal, defendant contends the trial court's failure to (a) conduct a new competency hearing prior to the revocation hearing and (b) appoint a public defender at his sentencing hearing violated his constitutional rights.  We affirm.

**BACKGROUND[1]**

In the underlying case, the trial court declared defendant incompetent to stand trial and ordered him placed at a state hospital for treatment.  After competence was restored, criminal proceedings resumed, and a jury convicted

_____

[1] We take judicial notice of the record in case No. A159933.  (Evid. Code, §§ 452, 459.)

1

defendant of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)),[2] false imprisonment by violence (§ 236), and two counts of disobeying a domestic relations court order (§ 273.6, subd. (a)).  The trial court then suspended imposition of sentence and placed defendant on five years' probation.

Ten months later, in October 2020, defendant was arrested for felony stalking (§ 646.9, subd. (b)) and harassing the victim using his social media account (§ 653.2, subd. (a)), and the district attorney filed petitions[3] to revoke his probation.  Defendant represented himself at the probation revocation hearing and sentencing.  The trial court found him in violation and sentenced him to four years in prison.[4]

## DISCUSSION

### *Competency*

A defendant is incompetent to stand trial, if "as a result of a mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (§ 1367, subd. (a).)  Trial of an incompetent defendant violates both state and federal due process guarantees.  (*People v. Smith* (2003) 110 Cal.App.4th 492, 499; see U.S. Const., 14th Amend.; Cal.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] The District Attorney also filed a subsequent petition to revoke defendant's probation after defendant:  twice "[f]ailed to sign a Mental Health Release of Information/Consent" as directed; and "[s]ubmitted a positive drug test" for methamphetamine.

[4] The sentence consisted of the upper four-year term for the felony infliction of corporal injury on a spouse/cohabitant count and a three-year upper term for the felony false imprisonment count, which was stayed pursuant to section 654.  As to counts 3 and 4—disobeying a court order—the court sentenced defendant to 256 days in jail with 128 days' custody credit and 128 days' conduct credit.

2

Const., art. I, § 15.)  Thus, "[a] person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent."  (§ 1367, subd. (a).)

Defendant points to the "prior incompetency findings," his "bizarre behavior in and out of court," and the prosecutor's "repeated, emphatic requests for the trial court to intervene" as substantial evidence that the court should have conducted further competency proceedings.  (Boldface & capitalization omitted.)

### *Prior Incompetency Findings*

The section 1372 report—finding defendant restored to competency to stand trial on the underlying charges—summarized the prior findings:  In May 2018, two psychologists evaluated defendant, one finding him competent to stand trial, the other finding him incompetent to do so.  Three months later, a third evaluator also found defendant incompetent to stand trial.

In the first report, Dr. John Shields opined defendant was competent to stand trial and stated defendant presented as " 'an angry and indignant man, intent on impressing upon this evaluator his righteousness and his innocence.' "  Defendant was a "cooperative, focused, and passionate man; . . . who is strong-willed, and wants to be in charge.  He did not show signs of acute mental illness" but did "appear as a bit hypomanic, and narrowly focused in his ideation."  Dr. Shields wrote defendant was "able to talk in detail about his case, and he communicated both an understanding of the purpose for and the nature of the criminal proceedings.  He is also able to assist his legal counsel if, and only if, he chooses to do so."  Finally, Dr. Shields did not recommend psychotropic or anti-psychotic medication and stated defendant had the capacity to make decisions regarding his medication.

Dr. Robbin Broadman opined defendant was incompetent to stand trial. Although defendant appeared to have "educated himself enough to understand what the process entails," he did not have the ability to assist counsel in the conduct of a defense because he "would not be able to make a logical presentation to an attorney, and definitely cannot represent himself." She maintained defendant "expressed increasingly paranoid ideas about everyone connected to the case," and was "grandiose with delusional beliefs about his charges, his relationship with the victim and his own abilities." His beliefs led him to dismiss "evidence and witnesses with faulty reasoning." While her differential diagnosis included delusional disorder, schizophrenia, and bipolar disorder, she stated there was "no evidence of a mood component, making Bipolar Disorder less likely" and defendant was "too high functioning to have Schizophrenia." She recommended antipsychotic medication and opined defendant lacked the capacity to consent to medication.

Dr. Sabrina Correa also opined defendant was incompetent to stand trial. Although defendant had a "factual understanding of the situation," he lacked the "capacity to rationally assist counsel." Her differential diagnosis "[r]ule[d] out" personality disorder, delusional disorder, psychosis, and bipolar disorder, but he had "traits of narcissism and possible delusions." She deferred the decision of whether "anti-psychotic medication is medically appropriate" for defendant to a psychiatrist, but concluded defendant had the "capacity to make decisions regarding anti-psychotic medication."

The court found defendant incompetent to stand trial and placed him at Napa State Hospital, and denied a request for involuntary medication.

Four months later, another evaluation was filed with the court. This evaluation was based in part on defendant's response to treatment as described by his doctors. One doctor noted defendant still lacked " 'insight

4

into his illness/delusional belief,' " while another opined defendant "was competent to stand trial." The latter doctor stated defendant "demonstrated intact knowledge of criminal proceedings and full understanding of the charges before him." She further stated defendant was "capable of working with counsel but chooses not to work with this specific one," and that "[a]ny current grandiosity is not impeding [his] capacity to evaluate his situation."

Based on the information before her, the evaluator determined defendant was "not yet competent to stand trial and should be retained for further treatment" but opined he "will achieve competence in the near future." Defendant still lacked "the ability to assist counsel in the conduct of a defense in a rational manner." He continued to insist "all of the charges are based on 'false allegations,' " he would not "acknowledge the alleged evidence against him," and "what he presented as evidence in his defense was full of theoretical information, . . . made up penal codes, and apparently delusional beliefs."

Three months later, in March 2019, another report—the section 1372 report—was filed, concluding defendant was now competent to stand trial. The evaluator opined, "with reasonable medical certainty, that [defendant] is able to understand the nature of the criminal proceedings," as evidenced by the fact that "[t]hroughout [his] assessments by [various doctors], there had been little to no concern about the adequacy of [his] knowledge about basic criminal proceedings." Further, his defense counsel also stated, "a lack of legal knowledge is not an issue" for defendant, and defendant's performance on different assessments indicated he had "sufficient knowledge of essential courtroom personnel and their respective roles to understand the legal proceedings and charges against him" and he had "an adequate

understanding of his charges and that he appreciated the severity and possible penalties."

The evaluator further opined defendant had "the ability to assist his counsel in the conduct of a defense in a rational manner," as evidenced by his interview with defendant which showed defendant has "improved with regard to considering information that 'contradicts his beliefs,' " and he had a "realistic understanding of the various strengths of evidence against him." Finally, although the evaluator opined that defendant still continued "to have delusions of jealous and persecutory types," these "delusions do not necessarily impede his ability to rationally assist his attorney in his defense." Defendant did not "evidence hallucinations, disorganized behavior, disorientation, or other symptoms," and he, "[t]herefore . . . would likely be able to perform adequately in similarly stressful situations, like working with his attorney or attending trial." And given his "demonstrated . . . ability to rationally weigh the pros and cons of incorporating various pleas and plea-bargaining into his legal strategy," defendant "will be able to aid his attorney in coordinating a legal defense strategy in a rational manner."

The trial court determined defendant had been restored to competency, and the criminal proceedings resumed.

### *Defendant's Behavior*

Turning specifically to defendant's behavior, he maintains that "[o]ver the course of several hearings," he made "bizarre statements, motions, and requests."

First, he identifies a "number of groundless motions" that were not heard by the judge who presided over the probation revocation hearing (Judge Wood) but were in the record.[5]

Next, he identifies a variety of statements he made at the probation revocation hearing, including that he believed there was a "distinction" between his name when written "in all caps and [his] name in the traditional manner," stating the different writings of his name indicated "there are separate entities." He also stated, "I am fully aware that I am under maritime law. There are no American flags in this courtroom," which he concluded made the proceedings "fictitious and illegal." The court commented there was "an American flag behind me next to the seal, also, the flag of the State of California. I don't think we need to address that any further."

Defendant also points to evidence presented by the prosecution, namely his Facebook postings.[6] One post read "discrimination by Allison Haley and the rest of the racist individuals who are actively participating in the kidnap attempt of [the victim's daughter]. 'Discrimination' was in all capital letters.

---

[5] Defendant cites to the following: (1) a motion requesting "max out option as probation is not providing any service that makes any sense," and alleging there is "an illegal no contact order" but that probation "wants me to take parenting classes . . . why?" violation of his civil rights and malicious prosecution; (2) a motion to "dismiss all restitution request or grant due process right to examine witness and present evidence," and alleging "the 'victim' stole defendant's dog . . . , 30K worth [of] construction material, petty cash, and owes for 25 years of rent"; (3) a request for judicial notice of a "proof of life, UCC-1 filing"; and (4) a request to take judicial notice of "perjury committed by [the victim and] . . . of the perjury and fraud committed by the [deputy district attorney] and . . . by Judge Elia Ortiz."

[6] The prosecutor presented several other posts and videos found on defendant's social media, however, we restrict our recitation to those relied on by defendant in his opening brief.

7

There was also a portion that read, [the victim's daughter] has no rights and continues to be held against her will."  In another post, he stated "the sheriff department doing their part in denying me evidence to suppress the fact— and fact is in all capital letters—that DA Allison Haley is assisting my ex in kidnapping our child. . . .  It is so obvious and they all know it.  [¶] . . . I'm calling you out Allison Haley and all fraud Napa judges, Kecia, quote, bag 'o rocks, end quote, Lind. . . .  [¶] And any and all members of law enforcement who continue to falsely arrest members in this community and have participated in the kidnapping of [the victim's daughter].  I am not going to back down."  Finally, one post stated "Leadership, this is [the child's] father. If you continued to deny my child my love I will continue to bust you out and expose you until your entire system is shattered.  Why?  Because you have taken from me, and you will know my name for your trespass.  Wendell Coleman."  Along with the post, there was an attached photo of a document which stated the victim's first and last name and stated she had not "shown up to a hearing in three months.  She even waived . . . 9K in restitution just so she didn't have to show up.  Who does that?  Why?"

He also points to several videos he posted in which he spoke of the victim's daughter "being illegally kidnapped.  He talked about the judges and the DA knowing about the kidnapping.  And then he talked about his ex [(the victim)] not showing up in court and he looked directly into the camera, raised his voice, looked angry, and said where the fuck is she?  Where is my child?  What tunnel do I have to go down, because you know I'm coming."  He stated there was "pedophilia activity going on here in Napa and human trafficking," in another video.  Defendant maintained he loved his child and there was "no stopping me.  I'll keep coming until I get my child back."

***Prosecutor's Statements***

At the revocation hearing, the prosecutor stated, "Your Honor, I have had concerns for a while now that have also been shared by other judicial officers other than yourself on the record regarding defendant's competence to be able to represent himself pursuant to 1368. Many of the comments that were made this morning caused me further concern in that regard. . . . I would invite the Court to declare a doubt at this point. I don't really have any logical responses to many of the things that Mr. Coleman is saying right now. . . . [¶] . . . [¶] I have concerns about his ability, notwithstanding the mental competency concerns I have of him being able to adequately represent himself in this matter without any of the discovery. There are several police reports, recordings taken off of the defendant's Facebook page and other documentation, audio recording from the victim in this matter, that I think that any competent person, attorney or not, would need in order to represent themselves and proceed with this hearing. [¶] So those are my concerns regarding going forward on anything. But I have an overall arching concern regarding the mental competency at this point."

The court responded, "Understood. And I would probably need to take a few moments to consult some resources regarding declaring a doubt. Not a lot of time. . . . [¶] I think also another possibility is to reconsider the *Faretta* waiver."[7]

After hearing from defendant, the court stated, "So I will say that I'm not—I'm not leaning toward declaring doubt today. I think it's possible I might reconsider the *Faretta* waiver, but I would probably need to take a few minutes to review the law on that." The court paused proceedings, and

---

[7] *Faretta v. California* (1974) 422 U.S. 806.

9

stated "I have reviewed *Faretta* and the requirements of *Faretta* and I am not inclined to change the previous decision regarding the *Faretta* waiver."

Defendant reminded the court he had not signed the *Faretta* waiver form and requested "a physical copy so that I can make a record and make this an official signing." The court provided him with the form, stating it would not make "any new findings" unless defendant indicated he "want[ed] counsel." Defendant replied, "No. The only reason why I wish to sign this document is to make it official."

At that point, the prosecutor stated that after speaking with "one of the chiefs of the Public Defendant's Office," that section 4011.6 could be "another option if the Court did have any concerns about Mr. Coleman's ability to adequately and competently represent himself in this matter without suspending proceedings."[8] The prosecutor further stated she did not "believe

---

[8] Section 4011.6, subdivision (a) provides, "If it appears . . . to any judge of a court in the county in which the jail . . . is located, that a person in custody in that jail . . . may have a mental health disorder, that person or judge may cause the prisoner to be taken to a facility for 72-hour treatment and evaluation pursuant to Section 5150 of the Welfare and Institutions Code and shall inform the facility in writing, which shall be confidential, of the reasons that the person is being taken to the facility. . . ."

Welfare and Institutions Code section 5150, in turn, provides, "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff, as defined by regulation, of a facility designated by the county for evaluation and treatment, designated members of a mobile crisis team, or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services. . . ." (Welf. & Inst. Code, § 5150, subd. (a).)

10

Mr. Coleman knows the law well enough to be able to competently represent himself."

When the court replied that "not knowing the law is not incompetence, not mental incompetence," the prosecutor continued, "I understand that, but based on what I've seen, I don't believe that he even understands what this proceeding is for. Mr. Coleman in his mind has an agenda about how he has been wronged prior to this and he is fixated on that portion of what happened years ago. I don't believe that he is of sound mind to be able to comprehend and grasp the concept of what is now happening, and for those reasons I don't think he is in a position to competently represent himself on these violations. [¶] I know that your Honor has not had a lot of interaction with Mr. Coleman. This may be your first interaction with Mr. Coleman that I am aware of. But based on the multitude of court appearances that I have had with him, those are my concerns. I can't argue with that. It has to be the Court's declaration. I just thought that I would provide a different avenue for the Court to use should the court not want to suspend proceedings."

The prosecutor went on to relate that a prior judge (Judge Ortiz) had "concerns" and "stated those concerns on the record." Additionally, defendant's former public defender had "doubt declared," and "[t]wo doctors did find him incompetent. He did spend time in the Napa State Hospital as a result of that. So that is the reason why I am bringing this up to the Court. If the Court does not share those concerns or the Court does not feel it's appropriate, that is absolutely the Court's decision."

The court denied the "request regarding competency" and continued the revocation hearing to allow defendant more time to prepare for the hearing.

At the continued hearing, defendant attempted to disqualify the trial judge and then requested a continuance.

11

The prosecutor objected to the continuance and again stated she "still very much harbor[ed] . . . concerns" of defendant's competence. She continued, "And I know that's not the question the Court's asking me right now, but I just want to be clear that it's not that he doesn't understand the court process. I think he understands why he's here and what's happening. I think the Court needs to look at the second prong of that and say is he really capable of assisting his attorney or assisting himself in this particular case. So I just want to throw that out there again, and I would encourage the Court to look at some of the medical reports that were prepared the last time he was found incompetent. Specifically I was reading this morning a report that was generated, and this was his 1372 report that was generated when he was found to have regained competency, and that was dated March 4th of 2019, is extremely extensive and goes into his diagnosis and some of the reasons why he was hospitalized in the first place."

The court denied the continuance and proceeded with the hearing.

### *Trial Court's Determination*

" 'Penal Code section 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if "a doubt arises in the mind of the judge" regarding the defendant's competence (*id.,* subd. (a)) and defense counsel concurs (*id.*, subd. (b)).' " (*People v. Wycoff* (2021) 12 Cal.5th 58, 82 (*Wycoff*).) "If the defendant is not represented by counsel, the court shall appoint counsel." (§ 1368, subd. (a).)

" 'A trial court is required to conduct a competence hearing, sua sponte if necessary, whenever there is substantial evidence of mental incompetence." (*In re Sims* (2021) 67 Cal.App.5th 762, 773 (*Sims*).) " 'This court has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right "to a hearing on

present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense." ' " (*Wycoff, supra,* 12 Cal.5th at p. 82.)

However, "the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence, and that when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Sims, supra,* 67 Cal.App.5th at p. 783.) "[W]hen a defendant has already been found competent to stand trial, ' "a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." ' " (*Ibid.*)

Further, "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require further inquiry." (*People v. Marks* (2003) 31 Cal.4th 197, 220 (*Marks*).) Nor is an appellate court in a position " ' " 'to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " ' " (*Ibid.*)

Accordingly, "[r]eviewing courts give great deference to a trial court's decision whether to hold a competency hearing." (*Marks, supra,* 31 Cal.4th at p. 220.)

At the close of the revocation hearing, the trial court stated, "I am prepared to rule in the matter. I've been obviously giving it a lot of thought over the last week. And I—it's been a challenging case, because—well, it's

always challenging when someone is representing themselves, regardless of who they are. And I felt—I have felt all along that [Defendant] was capable of doing it and has done it and has actually in a lot of ways done a very good job."

There were times, said the court, "where I've had to kind of rein it in, and I know you've [that is, defendant,] disagreed with me. We got all those disagreements on the record." Further, it was evident defendant had "an absolute passion over the issue of wanting to regain custody and visitation of your daughter. Absolute passion over feeling that you have been discriminated against, mistreated, treated unfairly by this court, by governmental systems here in Napa. That is all very clear."

Defendant analogizes his situation to that of the defendant in *Sims, supra,* 67 Cal.App.5th 762. In fact, he claims his case is "exactly like" that of the defendants in *Sims.*

In that case, the defendant had "previously . . . been evaluated to determine her competency in the early stages of the homicide prosecution." (*Sims, supra,* 67 Cal.App.5th at p. 776.) The psychiatrist examiner concluded Sims "was unable to cooperate with her defense attorney," but "speculated that she might be able to cooperate with another attorney." (*Ibid.*) The examiner also "cautioned that he had 'concerns that [Sims'] condition may deteriorate now that she is no longer taking her medication in the jail' and that '[s]hould her condition deteriorate, it is quite likely that she would become not trial competent.' " (*Ibid.*)

The Court of Appeal recognized that "the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence." (*Sims, supra*, 67 Cal.App.5th at p. 783.) However, "there was more than

14

'minor changes' in [Sims's] mental state." (*Ibid.*)  The trial court had knowledge of her "long standing" mental illness and that she "was not taking medication" and knew that as result her "mental state would deteriorate." (*Id.* at p. 779.)  "As predicted," Sims "continued to deteriorate and dissemble in front of the entire courtroom." (*Id.* at p. 776.)  The record was replete with bizarre statements by Sims, including contending that her husband was alive " 'when the coroner's photographs were taken,' " proposing he had been " 'beaten and murdered . . . in custody,' " and cross-examining the pathologist about " 'his experience with "[s]atanic ritual killings" and torture.' " (*Id.* at p. 769 & fn. 1.)  Additionally, although Sims represented herself in part of the proceedings, her advisory counsel twice attempted to declare doubt as to her competency. (*Id.* at p. 769.)

Here, in contrast, the record does not demonstrate any substantial change in circumstances.  Defendant did not, and does not, maintain that his condition deteriorated or that he stopped taking any medication.  Indeed, he never took any medication, and most of the doctors who evaluated him determined he was capable of deciding whether to begin antipsychotic or psychotropic medication.  Defendant declined to do so, and there was never a court order for involuntary medication.

Moreover, it is clear from the record that the trial court viewed defendant's sometimes bizarre statements as frustration over how he viewed his treatment at the hands of the government, rather than as symptoms of changed mental circumstances that necessitated further competency proceedings.

Accordingly, on this record, the trial court did not err in not conducting further competency proceedings.

15

*Appointment of Counsel*

Defendant acknowledges he waived counsel during the *revocation* proceedings, but claims he "obtained assurances from the trial court that it would appoint the public defender if [he] decided it was necessary in the future." He therefore asserts that the trial court's "failure to appoint the public defender when [he] requested counsel at *sentencing* violated his Sixth and Fourteenth Amendment rights." (Boldface & capitalization omitted, italics added.)

### *Background*

At the beginning of the revocation hearing, defendant asked to represent himself. Accordingly, the trial court gave the appropriate advisements and reviewed the waiver form. Toward the end of the advisements, the following colloquy occurred:

"[The Court]: All right. Do you . . . understand that you have the right at any time to hire your own attorney, but that the Court won't delay your case to allow an attorney to prepare to represent you. Do you understand that?

"[Defendant Coleman]: Um. Hmm.

"[The Court]: I can put that another way to try and simplify it.

"[Defendant Coleman]: I'm reading this. So would I be able to recant my decision, based on the—if on whether or not I'm able going to be released to perform proper investigation?

"[The Court]: What this says is that you have the right to hire an attorney at any point.

"[Defendant Coleman]: Right. I understand that.

16

"[The Court]: But what this says is that if you do hire your own attorney, the case isn't going to get delayed so your attorney can prepare to represent you at the last minute, so something like that.

"[Defendant Coleman]: Understood. So my question is, can I take back my decision, because I have not been able to work since June of 2020. I was put on ankle monitor which my company policy is I cannot work. So I've been without work since June of 2020 because of the probation department's recommendation. [¶] So I don't have the funds, because I exhausted my funds, because of the probation recommendation, surviving without work. [¶] So my question is, if I do not have money, can I still get the public defender in the event I change my mind based on the decision on whether or not I'm going to be stuck in here on false allegations?

"[The Court]: Yes.

"[Defendant Coleman]: I can change my mind in the future?

"[The Court]: Yes. But what this is saying is that—

"[Defendant Coleman]: Help from the public defender because I do not have the funds.

"[The Court]: Do you want me to appoint the public defender now?

"[Defendant Coleman]: No, I want to know if I'm going to—if you're not going to allow me the opportunity to bail out or to be ORed, then I'm going to have to, because I won't have sufficient capability of getting information while I'm stuck in here. I would have to see how that would start to work out, considering the limitation to phone access, and basic things like that.

"[The Court]: All right. So Mr. Coleman, you want to represent yourself right now; is that right?

"[Defendant Coleman]: Yes. Yes."

At the start of the sentencing hearing, defendant began by acknowledging he had received the probation report and sentencing memorandum but asked for a continuance because he had not been given the requisite statutory amount of time to review the documents. The prosecutor conceded he was entitled to five days.

Before addressing the continuance, the court stated, "I want to make sure that you understand that you are facing up to six years incarceration, including four in the Department of Corrections. And I want to remind you that you're entitled to counsel. [¶] So I would like to address that issue, just to confirm, because I know you wanted to represent yourself in the underlying matter. I just want to give you another opportunity, because obviously the stakes are high."

Defendant responded, "When it comes to receiving counsel, because at the initial beginning of these proceedings, Kecia Lind was in the huddle with no less than five attorneys, one of which was the Chief of the Public Defender's Office, which handed her like a nine[-]inch thick book when she came back in, and was trying to get a mental doubt claim under 4011.6, after the attempt of a 1368 failed. [¶] So I do not want to—I do not trust—I believe there's prejudice from the Public Defender's Office. I heard—I personally had a horrible experience with the Public Defender's Office here in Napa. . . . [¶] . . . [¶] So if the court is going to appreciate the civil rights protections provided me by the United States Constitution under the Sixth Amendment and Fourteenth Amendment, I would like to select an attorney or get one from out of county, if possible."

The court replied the "right to counsel does not include the right to choose your counsel. If you want an attorney, I will appoint what we offer.

18

The Public Defender's Office is the starting point, and they determine if there's a conflict. If not, they're appointed. And you have some options with that."

The prosecutor then pointed out if the court was appointing counsel, the continuance would need to be longer than five days so counsel could get "up to speed." However, if defendant was "not requesting that the Public Defender be appointed, we can set it relatively sooner if he wants to represent himself. So I think the Court needs to determine what he would . . . like to do in that regard first."

Defendant responded, "I think I was clear with my request." The court further inquired, "I understand what you asked of me, that you would like me to appoint counsel of your choosing, or counsel from out of county. And my response to that is no. So does that mean you do not want me to appoint counsel?" Defendant then requested a continuance "not only because of the procedural violations" but also to "check the legality of denying me counsel based on the fact that I have requested counsel, because of civil rights violations."

The court granted the continuance, reiterating that "what I'm hearing is you are not willing to accept counsel" but that defendant wanted "time to look into the issue."

At the continued sentencing hearing, defendant first began by "requesting relief from the deadline for filing a statement in aggravation and mitigation," which the court denied. He then attempted to disqualify the judge, which the court also denied. At that point, the following colloquy occurred:

"[Defendant]: I would like an attorney.

"[The Court]: And we talked about this at the last hearing and—

19

"[Defendant]: And there was no way for me to reach out to the court and sit there and explain the situation of a lack of access to the law library to understand the concurrent sentences versus consecutive sentences, nor was there the opportunity to revisit, nunc pro tunc, the initial fraudulent probation report.

"[The Court]: Okay, thank you. [¶] Based—I did give thought to this being a potential request of yours today. Based on the totality of the proceedings, including your response at the last hearing when I inquired about a withdrawal of your *Faretta* waiver where you indicated that you just believe that they are all part of a conspiracy against you, I am going to exercise my discretion to deny your request for counsel at this time. [¶] . . . [¶] I believe the *Faretta* wavier was entered into knowingly and voluntarily and that the request for counsel at this time is only based on an intent to delay and obstruct these proceedings, so I'm going to deny the request, exercising my discretion to do so at this time."

When defendant inquired how the court was "formulating [its] conclusions," the court stated it was based on the "manner of [defendant's] behavior throughout and [his] communications regarding appointment of the counsel at the last hearing." [9]

### *Trial Court's Ruling*

Defendant first asserts that "[b]ecause [he] conditioned his waiver of counsel upon his ability to have counsel reappointed, the trial court was

---

[9] Thus, as the Attorney General observes, at no point during these two hearings did defendant raise the ground he is now asserting on appeal—that he had "conditioned" his waiver of counsel on the trial court's supposed agreement, and subsequent obligation, to reappoint counsel if, and when, he so chose.

20

obligated to grant his request at the sentencing hearing." (Capitalization omitted.) He maintains his "waiver . . . was obtained only after the trial court repeatedly assured him that he could have the public defender reappointed if he decided it was necessary."

However, as our recitation of the facts demonstrates, defendant's characterization of his waiver is not accurate. He did not make a "conditional" waiver. Rather, he repeatedly asked if he could "change" his mind. The court correctly assured him he could, but also warned him that doing so at the last minute would not also get him a continuance. "[T]he case isn't going to get delayed so your attorney can prepare to represent you at the last minute."

A criminal defendant has the constitutional right to be either self-represented or represented by counsel. (*Faretta, supra,* 422 U.S. 806, 819.) But once a defendant knowingly and voluntarily waives the right to counsel— as defendant did here—the right is no longer absolute. (*People v. Gallego* (1990) 52 Cal.3d 115, 163–164 (*Gallego*).)

Defendant cites to *Robinson v. Ignacio* (9th Cir. 2004) 360 F.3d 1044, as "instructive" on the correct standard of review. The federal court held a defendant who has waived his right to counsel may reassert that right at a sentencing proceeding, and the Sixth Amendment requires counsel to be reappointed absent a showing a bad faith. (*Robinson,* at pp. 1058–1059.) In so holding, the circuit court relied on *Menefield v. Borg* (9th Cir. 1989) 881 F.2d 696 (*Menefield*), which concerned the reassertion of the right to counsel during a motion for new trial, and wherein the court stated, " 'in the absence of extraordinary circumstances,' a defendant's post-trial revocation of his waiver should be allowed unless the government can show that the

21

request is made 'for a bad faith purpose.' " (*Robinson,* at p. 1058, italics omitted, citing *Menefield*, at p. 696.)

However, California courts "are not bound by the decision of the lower federal courts even on federal questions." (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) And, as defendant acknowledges, in *People v. Ngaue* (1991) 229 Cal.App.3d 1115 (*Nague*), Division Two of this court declined to follow the "bad faith" rule enunciated in *Menefield* "because in a related context our state Supreme Court has allowed trial courts greater discretion than have the federal courts." (*Id.,* at p. 1124.) The *Ngaue* court observed that while "no California case has addressed the specific question of withdrawal of a *Faretta* waiver *after* trial, such withdrawal *during* trial" had been addressed as one of trial court discretion. (*Ibid.*) In that regard, once a defendant has proceeded to trial "on a basis of his constitutional right of self-representation, it is thereafter within the sound discretion of the trial court to determine whether such defendant may give up his right of self-representation and have counsel appointed for him." (*People v. Elliott* (1977) 70 Cal.App.3d 984, 993 (*Elliott*).)

In exercising its discretion, a trial court should consider such relevant factors as: "(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney." (*Elliott, supra*, 70 Cal.App.3d at pp. 993–994.)

None of these, however, are absolutes. " '[I]n the final analysis it is the totality of the facts and circumstances which the trial court must consider in

exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation midtrial.' " (*Gallego, supra*, 52 Cal.3d at p. 164.)

The *Ngaue* decision remains the controlling California view, and we agree with its approach.

Further, even under the stricter, "bad faith" federal standard, the trial court did not err in denying defendant's request to withdraw his waiver and reappoint counsel. (*Ngaue, supra*, 229 Cal.App.3d at p. 1126.) "[E]ven under *Menefield*, the trial court retains discretion to deny a request for posttrial assistance of counsel where the request is made for a bad faith purpose, and factors such as the defendant's history in substitution of attorneys or purpose to delay further proceedings may bear on the determination whether such a bad faith purpose exists." (*Ibid.*)

Here, defendant could have asked for counsel at any point during the proceedings, including when he was granted a continuance of the sentencing hearing to review the probation report and sentencing memorandum. Instead, he insisted—incorrectly—that he was entitled to appointment of counsel outside the public defender's office. When the trial court explained he had no such entitlement, he did not pursue the matter. Under the circumstances, the court did not abuse its discretion in viewing defendant's eleventh-hour request for counsel as "only based on an intent to delay and obstruct these proceedings."

In any event, any error in failing to appoint counsel for the continued sentencing hearing was harmless. (*Ngaue, supra*, 229 Cal.App.3d at pp. 1126–1127 [erroneous denial of request to retract *Faretta* waiver not an

error of constitutional dimension[10]].)  Although defendant maintains "there was much for counsel to do at this hearing," he does not challenge the probation report which stated there were no factors in mitigation.  Nor does he identify any factors in mitigation.  (See Cal. Rules of Court, rule 4.423.) He also does not take issue with the trial court's finding of four factors in aggravation.[11]  Finally, although he claims he "expressed confusion as to the custody credits," the trial court discussed the credits at length with defendant and the prosecutor, and he does not posit how the custody credits would have been different had defense counsel been appointed.

## DISPOSITION

The judgment is affirmed.

---

[10]  *Ngaue* also rejected *Menefield's* ruling that "automatic reversal" was required where court erred in refusing to allow the withdrawal of self-representation.  (*Nague, supra*, 229 Cal.App.3d at p. 1126.)

[11]  These were: (1) "the crime involved serious violent acts disclosing a high degree of cruelty in that the victim sustained serious injuries to her face and bruising to her arms and frightened her to the point of urinating herself" (Cal. Rules of Court, rule 4.421(a)(1)); (2) "the victim was particularly vulnerable in that she was a new mom caring for her baby and been harassed by defendant over time regarding suspicions and threats" (*id.*, rule 4.421(a)(3); (3) "the defendant threatened witnesses and unlawfully dissuaded witnesses through unfounded legal actions and police reports and filing a baseless report for his delusional theories" (*id.*, rule 4.421(a)(6); and (4) "the defendant took advantage of a position of trust in that he was the victim's live-in partner and father of their young child" (*id.*, rule 4.421(a)(11)).

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A161731, People v. Coleman

25